AUSTIN TERM, 1886.

No. 5065.

GEORGE MCCORMICK v. THE STATE.

1. PRACTICE—CONTINUANCE.—The absent testimony set out in the appli-
cation for continuance being probably false, the trial court did not err
in overruling the application, nor in refusing to grant a new trial on ac-
count of it.

2. ROBBERY—INDICTMENT—CHARGE OF THE COURT.—The indictment
charged a robbery by means of assault, violence and putting in fear.
The proof shows that the defendant, at night, with his hat pulled down
and his collar turned up. met the injured party and summoned him to
throw up his hands, stating that he was an officer of the law, and would
arrest the injured party for being drunk and noisy; that the injured
party (who testified that he was much alarmed) threw up his hands,
and the defendant then took a roll of money from the pocket of the said
injured party. *Held* that the proof sustains an indictment for robbery
by putting in fear, wherefore the trial court did not err in refusing a
requested charge to the effect that the jury should acquit the defend-
ant if they believed that he obtained the money by so personating an
officer that the injured party, believing him to be an officer, permitted
him to take the money.

APPEAL from the District Court of Bexar.   Tried below be-
fore the Hon. G. H. Noonan.

The conviction in this case was for the robbery of Will Ad-
ams, in Bexar county, Texas, on the twenty-fifth day of Feb-
ruary, 1886. The penalty assessed against the appellant was
a term of five years in the penitentiary.

Frank Couch was the first witness for the State.  He testified
that he had known the defendant, who was a hack driver,
about two years.   The witness met Will Adams, the injured
party, for the first time, in Lockwood's saloon, on the corner of
Houston and Losoya streets, in San Antonio, on the night of
February 24, 1886.  The witness and Jim and Pat Campbell, Will
Solcher and others were in that saloon, about nine o'clock on
the said night, when the defendant and Adams came in.   After
standing around in the saloon a short time. a game of cards for
drinks was proposed.   The witness and Jim Stevens played
as partners against the defendant and Adams, the game being

whisky poker. Tom Stevens was then tending. bar. Four games were played in the bar room, three of which were lost by defendant and Adams; for which Adams paid. When the third game was decided against Adams and defendant, Adams said to defendant: "Partner, it is about time you were paying for some of these drinks." Defendant replied: "That is all right; you pay for them now, and I will pay you back in the morning." The witness did not see any money in the possession of the defendant while in Lockwood's saloon with Adams. No money was played for at any time, and drinks were the only stakes involved in the game. Between twelve and one o'clock Adams left the card table and passed out of the saloon at the side door, accompanied by the witness and defendant. They went to the water closet, returned to the saloon and then adjourned to the room in the rear of the bar room and resumed the game of cards, playing poker as before, for the drinks and not for money. Jim Satterwhite took Stevens's place as the witness's partner. Before beginning the game in the back room, Adams paid for the drinks with silver money which he took from his lower vest pocket. Adams and defendant lost the games played in the back room, after which the party returned to the bar room, and Adams, standing in front of the bar, with witness and defendant on either side of him, paid Tom Stevens, the bar keeper, for the drinks lost at the last playing. He paid for them with a five dollar bill extracted from a roll of bills which he took from his left upper vest pocket. Adams returned the roll of bills to the said upper vest pocket, and received from Tom Stevens three dollars and a half in change on the five dollar note—his bill to the bar being one dollar and a half. It was then about half past two o'clock in the morning.

When he received his dollar and a half in change, Adams, accompanied by the witness, left the saloon, going out at the door on Losoya street. Defendant followed witness and Adams, who went down Losoya street to Main street. Adams was then pretty drunk. When the corner of Main and Losoya streets was reached, Adams said that he wanted to go to the Stock Exchange. He and witness then went down Main street east to Alamo street, and thence south down Alamo street to South street. Near the corner of South and Rusk streets Adams announced that he was going into a house that attracted his notice, but witness told him that it was the private residence of Mr. Henry Dulnig. Thence witness and Adams went down

Rusk to Lavaca street, thence to the Mission Garden, and thence to Garden street. Throughout this journey the defendant followed close behind until a point near the Mission Garden was reached, when he dropped back a short distance. At the corner of Presa and Garden streets, near the bridge, the defendant, with his hat pulled down and his coat collar turned up, intercepted the witness and Adams, and called to them: "Hold up your hands! I am an officer of the law. You are drunk and making a noise; I will take you in; both of you hold up your hands!" The witness and Adams stopped at once and threw up their hands, and defendant came up and examined the witness's vest pockets and got nothing; after which he put his hand in Adams's upper left pocket and drew forth the roll of bills. Defendant then said: "March on!" Witness and Adams went about a hundred yards when witness heard a whistle. He left Adams and returned to the defendant, whom he found under a street lamp counting the money. Defendant, remarking "there is your share," handed witness what he said was forty-five dollars. Witness counted the money given him by defendant, and found among the bills a fifty dollar note, which defendant had evidently taken for a five dollar note. Witness thereupon handed thirty-five dollars back to defendant, remarking: "It is only thirty-five." He kept the the fifty dollar bill. Witness and defendant then started back towards Lockwood's saloon, going up Alamo street. En route defendant handed him a twenty dollar bill, and said that a third party, whose name he did not mention, was yet to get twenty dollars of the money. At a point further up Alamo street, defendant remarked: "It won't do for us to be seen together; we had better part."

Accordingly they separated, and went to Lockwood's saloon by different routes, arriving within a few minutes of each other. It was then about four o'clock. Tom Stevens was still "on watch" behind the bar, and Jim Satterwhite and Allee, the merchant policeman, were in the saloon. Defendant remarked: "I have made a winning," and invited the witness, Tom Stevens and Allee to take a drink with him, which they did, and for which the defendant paid Stevens a bill, receiving silver in change. About that time witness handed to Tom Stevens the twenty dollar bill he had obtained from defendant, and told him to take out of it twelve dollars and some cents he was owing the bar. Tom Stevens did so, giving witness the change

in silver. A few minutes later defendant handed Tom Stevens a five dollar bill and asked him to "put that with the balance." Stevens took the bill, remarking: "That makes forty." When defendant, claiming to be an officer, ordered witness and Adams to throw up their hands, Adams, who had sobered up somewhat, said, "all right," and threw up his hands. Billy Emmick was in Lockwood's saloon when Adams arrived on that night, but left while the cards were being played. and was not at the saloon when Adams, witness and defendant left it. Jim Satterwhite was at the saloon when witness, Adams and defendant left. He was not present at the robbery. Witness left Adams, after the robbery, near the mill bridge on Garden street. Witness met Adams at police headquarters on the morning after the robbery, when Adams recognized him instantly. Witness did not see Adams and defendant together on that morning, and could not say whether Adams recognized defendant or not. The money taken by defendant from Adams was in United States currency, consisting of one fifty and two twenty dollar bills, and the balance—making in the aggregate one hundred and fifteen dollars, as counted by witness—was in five and ten dollar bills. On the morning after the robbery, the witness delivered to Deputy City Marshal Hughes fifty-five dollars in currency, including the fifty dollar bill which defendant took from Adams and gave to him.

On cross examination, the witness stated that he was charged by indictment with complicity in this offense, and had been confined in jail until he was placed upon the stand to testify on this trial. Adams was pretty drunk when he and witness and defendant left Lockwood's saloon. He walked between the witness and defendant after leaving the saloon, and was between them when he said that he wanted to go to the Stock Exchange. He then went down Main street, in an opposite direction from the Stock Exchange, notwithstanding witness told him he was going wrong. At the corner of Rusk and South streets, Adams pushed defendant away from him, making considerable noise, and telling defendant that he wanted nothing to do with him. He then started into Dulnig's residence. Witness did not at first recognize defendant when he ordered "hands up," and witness asked: "Who in the hell are you?" Witness, however, recognized defendant before he reached Adams. Witness threw up his hands, but was not in the least alarmed. Adams was badly scared. Defendant put his hand

in witness's pocket but got nothing. He then put his hand in Adams's vest pocket and took out the roll of bills. Witness said nothing while the robbery was being perpetrated.

Thomas E. Stevens was the next witness for the State. He testified that he was employed as bar tender at Lockwood's saloon, on the corner of Losoya and Houston streets, in San Antonio, Texas, and was so employed at the time of this alleged offense. He first saw Will Adams on the night of February 24, 1886, when he and the defendant came into that saloon together. They came about nine o'clock, and played a game or two of cards together, and then made up a party of four, consisting of Frank Couch, Jim Stevens, defendant and Adams, the two first named playing as partners against defendant and Adams. Jim Satterwhite was in the saloon at the time. The game played was whisky poker, the stakes being drinks all around. Adams and defendant lost the first game, and Adams paid witness for the four drinks delivered by him. The second game resulted as did the first, and Adams again paid for the drinks, the four drinks amounting to fifty cents. The third game resulted as did the first two, and when the witness again delivered the drinks, Adams put his hand in his lower vest pocket and produced thirty cents, which was not enough, and he asked defendant: "Partner, can't you do this?" Defendant replied: "You pay for them now, and I will make it all right in the morning." Adams then told witness that he would pay later. Another game was played which resulted as did the preceding ones, leaving Adams in debt to the bar in the sum of one dollar. Adams then got up and went to the rear. When he came back he was "stuck" for another round of drinks, increasing his indebtedness to one dollar and a half, which he discharged by giving witness a five dollar bill, and receiving his change—three dollars and a half—in silver. He took the five dollar bill from a roll of currency notes which he took from his left upper vest pocket. He then placed the roll in one of his pockets—the witness did not observe which. At that time he was standing in front of the bar, with Couch and defendant standing near him. The party then retired to the rear room and recommenced the game, Jim Satterwhite taking the place of Jim Stevens as Couch's partner. Adams and defendant lost three rounds of drinks in that game, for which Adams paid the witness a dollar and a half. Neither Couch nor defendant had

any money when either of the games were played, that the witness saw.

At about half-past two o'clock in the morning Adams and defendant, the latter holding Adams's arm, left the saloon together, going out at the door on Losoya street. Couch was then standing at the bar, looking at Adams and defendant as they went out. Within a few moments after Adams and defendant left, Couch left the saloon, going out at the Houston street door. Witness did not observe the direction taken by either Couch or defendant or Adams. Witness did not see Adams again on that night nor the next day, but about half-past four o'clock in the morning defendant came back into the saloon, and Couch came in about a minute. Both Couch and defendant had money when they got back to the saloon. Couch had a twenty dollar bill that the witness saw. Defendant, soon after he got back to the saloon, speaking to Allee, who was present, said: "Come up, Allee, and take something; I have made a winning." Witness, Couch, defendant and Allee drank, and defendant handed witness a five dollar bill, and witness gave him the change—four dollars and a half in silver. A few minutes later the defendant handed witness some currency bills with the request to put them away for him. The bills amounted to forty dollars. A few minutes later Couch handed witness a twenty dollar bill out of which witness took the sum of twelve dollars and seventy cents, which Couch owed the bar, and witness gave him change in silver. On the next day the witness gave Captain Hughes, assistant city marshal, the same forty dollars which defendant deposited with him for safe keeping, as stated. Witness could not identify the ten dollar bill exhibited on this trial as one of the bills he received from the defendant. When witness left watch early the next morning, he handed the forty dollar roll to his relief, stating to him that defendant had left it there for safe keeping. When witness came on duty again, he received the forty dollar roll just as he last saw it.

Will Adams was the next witness for the State. He testified that he came to the city of San Antonio from the State of Arkansas, reaching the said city on the twenty-second day of January, 1886. He remained in San Antonio but a couple of days, when he went to work in the country. He returned to San Antonio on the twenty-fourth day of February, 1886. Between eight and nine o'clock on the night of that day, he went to the Stock Exchange saloon, having in the upper left hand

pocket of his vest a roll of greenback money amounting to one hundred and forty-five dollars and a few dollars in silver loose in another pocket. The defendant was in that saloon when the witness went in, and, as well as witness could recall, it was the first time he had ever met the defendant. Witness stepped to the bar and called for a drink, when the defendant said to him: "Hello! Where have you been? I could have gotten you several jobs if you had been here." Witness replied: "Is that so? I am sorry I was not here; look out for me again." Defendant replied that he would, and witness invited him to take a drink; which he did. Defendant and witness then went from the Stock Exchange to Brady's saloon, where witness treated again, himself drinking whisky. Defendant then proposed a walk, and witness assented, proposing to visit some Mexican houses of ill fame. Defendant assented and proffered to show witness the way — witness being a perfect stranger in the city, without knowledge of localities or even the name of a street. After walking around apparently at random for some time, witness asked: "Where are we going?" Defendant said: "Let's go in here," leading the witness into a saloon, the name or locality of which the witness did not know. They found two or three gentlemen around a table. Defendant proposed that he and witness join those gentlemen in a game of cards for drinks. Witness objected that he could not play any game at cards. Defendant got a deck of cards and he and witness played a game or two by themselves, when defendant again insisted on joining the other party in a game for drinks. Witness objected again; but, rather than appear disagreeable, finally consented, and he and defendant played as partners against two other gentlemen whom witness did not know, but whose names he ascertained to be Couch and Jim Stevens. The first and second games were lost by witness and defendant, and were paid for by witness. When they lost the next or third game, witness proposed that defendant should pay for that round of drinks. Defendant replied that he had no money, but would refund his share of the losses on the next morning. Having to pay all of the bills disgusted witness, and he quit the game and, attended by Couch and defendant, went to the water closet. They soon returned to the bar room, and in a few minutes resumed playing in the back room, another man taking Stevens's place as Couch's partner. After playing two or three games, which witness and defendant lost, the witness quit, and,

accompanied by Couch and defendant, went to the bar to pay for the drinks. Having no change, he took his roll of bills from his upper vest pocket, from which he took a five dollar note, which he handed to the bar keeper, receiving the change in silver. Couch and defendant were then near witness, and saw him produce the roll of bills and replace it in his vest pocket.

Almost immediately the witness left the saloon, accompanied by Couch. When he reached the sidewalk he remarked that he wanted to go home. Couch proposed to go with him. Witness and Couch had gone but a short distance when witness felt some person grab at his vest pocket. He at once hallooed, exclaiming that somebody was trying to rob him. He heard the party say: "I didn't get it." Witness then attempted to get away by himself, but Couch went with him, a short distance further, when the defendant appeared and said: "You have been disturbing the peace and keeping up a noise; hold up your hands and surrender; I am an officer." Defendant then had his coat collar turned up and his hat pulled down. Witness and Couch stopped and threw up their hands, whereupon the defendant approached and took the witness's roll of bills from his upper vest pocket. Defendant did not examine Couch's vest pocket. Immediately upon securing the money, defendant and Couch disappeared together. The amount taken by defendant was one hundred and forty dollars in currency, consisting of one fifty and two twenty dollar notes, and the balance in ten and five dollar notes. The witness was very much alarmed, and submitted to the robbery because he feared that to resist would be to invite assassination. After being robbed, the witness hunted and found a lodging house and went to bed. On the next morning he reported the robbery to Captain Hughes, and gave him a description of Couch and defendant. Later in the day he went to police headquarters, where he saw and at once recognized Couch and the defendant. Hughes afterwards showed him a fifty and four ten dollar bills, of which, by peculiar marks the witness recognized the fifty and one of the tens as two of the bills of which he was robbed by the defendant. At this point the defense admitted that the fifty dollar bill was the one which Captain Hughes recovered from Couch, and that the ten dollar bill identified by the witness was one of four of like denomination which were turned over to Hughes by Thomas E. Stevens.

Cross examined, the witness said that he drank whisky in the

last saloon he visited on the night of the robbery. He did not count, nor did he have an idea as to the number of drinks he took during the night. The last saloon the witness was in was not more than a hundred yards distant from a bridge. Couch left that saloon with the witness. Witness left when he did because he became convinced that he was in a bad crowd and he wanted to get away. He and Couch had not gone far— not above two hundred yards—when the first attempt to rob him was made. They had gone somewhat further when the robbery was accomplished. The witness was neither drunk nor sober at the time of the robbery. He could not remember now that on the examining trial he testified that he drank gin at Brady's saloon. To him, however, there was no appreciable difference between whisky and gin. Couch left witness immediately after the robbery. Witness had no recollection of telling Captain Hughes that the man who robbed him was a tall man and wore a black slicker. Witness did not know the defendant's name at the time of the robbery.

Assistant City Marshal T. J. Hughes testified, for the State, that, on the morning of February 25, 1886, Will Adams reported to him that he was robbed on the night before by two men whom he described to witness. Acting upon that description the witness arrested the defendant and Couch, whom Adams at once identified as the men who robbed him. Witness recovered from Couch a fifty and a five dollar bill, the former corresponding with the fifty dollar bill described by Adams. Witness afterwards got four ten dollar bills from Tom Stevens. The bills now in evidence were the bills recovered by witness from Couch and Stevens. Adams told witness that the man who did the actual robbing had on a black slicker and personated an officer.

R. D. Allee testified, for the State, that he was in Lockwood's saloon about four o'clock on the morning of February 25, 1886, when defendant came into that saloon. He remarked to witness: "Come up and have a drink; I have made a winning." About that time Couch came into the saloon. Couch, witness, Tom Stevens and defendant took a drink, for which the defendant paid. Just then Jim Satterwhite came into the saloon, and defendant said to Couch: "What is the matter with your setting them up? You made a winning too." Couch then treated the crowd, and witness left. Couch paid for the drinks with a five dollar bill from a roll he had doubled up in his hand. Defend-

ant did not have on a black slicker that night, but Satterwhite did.

After some other unimportant testimony the State closed.

Annie Freeman testified, for the defense, that she kept a boarding house on Acequia street. Defendant boarded with her in February, 1886. He came to his room about three o'clock on the morning of February 25, left within a few minutes, and came back about six. Witness did not see him, but heard him mounting the stairs to his room.

Barney Mitchell testified, for the defense, that he was bar tender for the Stock Exchange saloon. Defendant visited that saloon on the evening of February 24, 1886, and had money enough to pay for some drinks he got. He had no greenbacks that witness saw. He came back to the saloon about three o'clock on the next morning, as near as witness could compute the time. He was not positive about the hour of defendant's return to the saloon, but it was between midnight and six o'clock a. m.

The opinion sets out the substance of the absent testimony on which was founded the application for a continuance.

*Brenneman & Bergstrom, T. G. Anderson* and *P. J. Lewis,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. This is an appeal from a conviction for robbery. Appellant moved for a continuance to procure the testimony of James Satterwhite, George Long and Billy Emmick, citizens of Bexar county. By Satterwhite he proposed to prove that Billy Adams, when robbed, was so drunk as not to be able to know what he was doing or saying, incapable of reasoning or knowing anything. Couch, a witness to the robbery, was not drunk, and his and Adams's account of the transaction corresponded remarkably well.

Again, the application is too vague; it fails to give us the facts from which it may reasonably be inferred that Satterwhite knew anything whatever of Adams's condition, more than a number of other witnesses. He was certainly not present at the robbery. On the other hand, the record furnishes us with the acts and conduct of Adams prior to and at the time of the robbery, and from these we are clearly of the opinion that he was not so drunk as not to know what transpired on the occasion of the robbery.

By George Long defendant expected to prove that defendant had money before the robbery, and by this proof to contradict Adams, who said defendant did not have money. Adams and others testified to the facts strongly tending to show that defendant had no money before the robbery, and other witnesses testified that he had money just after the robbery. Nor does the application state how Long ascertained how appellant procured the money. The money was recovered by an officer next day, and was recognized by Adams as that which had been taken from him. Hence we do not believe that, if Long had been present and swore to the facts as stated in the application, they would have been probably true.

By Emmick the defendant expected to prove that defendant and Adams played poker before the robbery, in the back room of Lockwood's saloon, and that defendant won ten dollars from Adams. If the desired witness had sworn to these facts, it would have been in direct conflict with the evidence of several witnesses as well as with the conduct of accused at Lockwood's saloon. Looking to the facts expected to be proved by the absent witnesses, in connection with the testimony and surrounding circumstances proved on the trial, we do not believe them probably true, and there is no probability that on another trial the result would be different. The court did not err in overruling the application.

At the corner of Presa and Garden streets, in the city of San Antonio, defendant came up with Couch and Adams, with his hat pulled down and his collar turned up, and said: "Hold up your hands! I am an officer of the law. You are drunk and making a noise; I will take you in; both of you hold up your hands." Adams and Couch threw up their hands. Defendant stepped up, put his hand in Adams's pocket, and took out a roll of bills. Adams swore that he was very much alarmed and through fear threw up his hands, and while his hands were up the defendant took his money.

Do these facts constitute robbery? We are clearly of the opinion they do. The indictment charged the robbery by means of assault, violence and putting in fear. If money was obtained by either means, the offense is complete.

Appellant requested the court to charge the jury: "If you believe from the evidence that defendant did obtain money from Will Adams, as charged in the indictment, then, if you further believe that he did so obtain said money from said Adams by

reason of personating an officer, and said Adams, believing defendant to be an officer, stopped and allowed defendant to take his money, then you will find defendant not guilty." The court refused this charge and defendant excepted. In this there was no error. For there is no evidence tending to show that defendant simply told Adams that he was an officer, and by that means obtained his money. The robbery was at night. Adams was a stranger in the city and, when accosted in the manner shown in the record, it was reasonable and quite natural for him to be alarmed. He was told at the outset to throw up his hands. Being thus suddenly accosted and ordered to throw up his hands, it was natural for him to become alarmed, and while thus situated the money was taken. We do not doubt that this was the matured plan of defendant—the method preconceived by which to effect the robbery.

The matter complained of in the bill of exceptions with regard to the testimony of Hughes is very satisfactorily explained by the learned judge in his explanation to the bill, and will not be discussed. But concede for argument's sake only that, abstractly considered, disconnected from the other facts, there was error which might have injured defendant, when considered in connection with the whole of the evidence we can not perceive how it was at all probable that there could have been any damage whatever. That appellant is guilty from the record there is no doubt, for the testimony is clear, convincing, and we think overwhelming.

We find no error in the conviction, and the judgment is affirmed.

Opinion delivered December 8, 1886.                *Affirmed.*