ROBERT MONTSDOCA AND JOE TRACY, *Plaintiffs in Error*, v. STATE OF FLORIDA, *Defendant in Error*.

Opinion filed July 3, 1922.

Petition for Rehearing Denied July 29, 1922.

1.  Under Section 5056 Revised General Statutes 1920 denouncing the crime of robbery there are several alternative ingredients of such crime. If property the subject of larceny is unlawfully taken from another by force, or violence, or assault, or by putting in fear the offense denounced by the statute is committed.

2.  Where an indictment charges the alternative ingredients of the offense of robbery conjunctively the charge will be sustained if either alternative ingredient is proven.

3.  Under the common law the putting of the victim in fear was not the only essential ingredient of robbery. The elements of robbery were lack of consent, force and violence used or the putting in fear of the person robbed.

4.  In the crime of robbery an intent to steal is essential, so is violence or putting the victim in fear and the violence or intimidation must precede or be contemporaneous with the taking of the property.

5.  In the offense of robbery the degree of force used is immaterial. All the force that is required is such force as is actually sufficient to overcome the victim's resistance and such violence need not be actual to constitute the offense. If the victim has a reasonable apprehension of violence which to avoid he parts with his property to the person unlawfully demanding it the offense is robbery under Section 5056 Revised General Statutes.

6.  To commit the offense of robbery under the Statute a threat of prosecution for a crime is regarded as insufficient to create fear, the one exception is a threat to bring against the victim a charge of the heinous offense of sodomy.

7.  Where one attacks another upon the public highway, assaults him by grasping him by the shoulder and shaking him, and commanding him to get out of the automobile in which he is riding forcefully takes possession of the automobile, and representing himself to be an officer of the law threatens prosecution for some imaginary offense by which conduct he induces the traveler to part with money which he does through fear of bodily injury and against his will such conduct is deemed to constitute the offense of robbery as denounced by Section 5056 Revised General Statutes.

A Writ of Error to the Circuit Court for Osceola County; C. O. Andrews, Judge.

Affirmed.

*Johnston & Garrett*, for Plaintiff in Error;

*Rivers Buford*, Attorney General, and *Marvin C. McIntosh*, Assistant, for Defendant in Error.

ELLIS, J.—Robert Montsdoca was indicted for robbery alleged to have been committed in Osceola County on May 17th, 1921 by taking from the person of W. S. Lamacks against his will sixty dollars in money, Montsdoca not then being armed with a dangerous weapon. Joe Tracy was charged in the same indictment as principal in the second degree being present aiding, inciting assisting and abetting Robert Montsdoca in the commission of the felony. See Henry v. State, 81 Fla. 763, 89 South. Rep. 136.

The defendants pleaded not guilty. Upon a trial of the cause a verdict of guilty as charged in the indictment was returned by the jury against both defendants. They seek to reverse the judgment upon writ of error.

There are thirty-one assignments of error all of which rest upon the evidence as being insufficient to support the verdict and the giving of certain instructions to the jury and the refusal to give others requested. Some of the assignments are argued in behalf of Montsdoca and others in behalf of Tracy. Many of the errors assigned are abandoned.

The theory of the defense is that the property was not obtained by Montsdoca and Tracy from Lamacks by putting him in fear within the meaning of the statute. That if it was obtained at all it was not obtained by violence nor by putting Lamacks in fear, that it was obtained by threats of arrest or criminal prosecution for other than sodomitical practices.

Section 5056 Revised General Statutes 1920 provides as follows: ''Whoever by force, violence or assault, or putting in fear, feloniously robs, steals and takes from the person of another money or other property, which may be the subject of larceny, (such robber not being armed with a

dangerous weapon) shall be punished by imprisonment in the State prison not exceeding fifteen years.''

The language of the indictment so far as it relates to the taking of the property is as follows: That Montsdoca ''by force, violence and assault and putting in fear, unlawfully and feloniously did then and there rob, steal and take away from the person of W. H. Lamacks against his will the sum of sixty dollars in lawful money of the United States of America,'' etc., ''The said Robert Montsdoca not being then and there armed with a dangerous weapon.''

Tracy was charged as stated with the offense of being then and there ''unlawfully and feloniously present aiding and inciting, assisting and abetting said Robert Montsdoca in manner and form and by means aforesaid the said felony then and there to do and commit.''

It will be observed from a careful reading of the statute that there are several alternative ingredients of the crime of robbery. If property the subject of larceny is unlawfully taken from another either by force or violence or by assault or by putting in fear, the offense denounced by the statute is committed. The indictment charges these alternative ingredients of the offense conjunctively and the charge should be sustained if either alternative ingredient is proven. See McDuffee v. State, 55 Fla. 125, 46 South. Rep. 721; Lewis v. State, 55 Fla. 54, 45 South. Rep. 998; Strobhar v. State, 55 Fla. 167, 47 South. Rep. 4; Bradley v. State, 20 Fla. 738; King v. State 17 Fla. 183; Gafford v. State, 79 Fla. 581, 84 South. Rep. 602.

In the case of Simmons v. State 41 Fla. 316, 25 South. Rep. 881 the defendants were charged with robbery by one of the methods only by which the statute declares the offense may be committed namely: ''putting in fear.'' In

that case the court speaking through Mr. Justice Carter said that the defendants by falsely representing and pretending that one of them was an officer and authorized to take the property, and by "then and there threatening to arrest and take into custody the said Rebecca Jackson (the victimized person) if she resisted them in the taking of said furniture" cannot be said to have put in fear the person alleged to have been robbed by that method. Under the common law the putting of the victim in fear was not an essential ingredient of robbery. At common law the elements of robbery were: the lack of consent, the force and violence used *or* the putting in fear of the person robbed. These elements distinguished robbery from extortion, obtaining goods under false pretense and larceny. See 29 R. C. L. 1139; 2 East's P. C. 707; 2 Bishop's Criminal Law 670; 4 Bl. Comm. 242.

According to the above authority the distinction between larceny and robbery is a nice one. "The criterion which distinguishes these offenses is the violence which precedes the taking. There can be no robbery without violence, and there can be no larceny with it. It is violence that makes robbery an offense of greater atrocity than larceny. Robbery may thus be said to be a compound larceny composed of the crime of larceny from the person with the aggravation of force, actual or constructive, used in the taking. 29 R. C. L. 1140; 34 Cyc. 1796.

An intent to steal is essential, so is violence or putting in fear.

See 34 Cyc. 1799. The violence or intimidation must precede or be contemporaneous with the taking of the property. See Colbey v. State, 46 Fla. 112, 35 South. Rep. 189.

The degree of force used is immaterial. All the force

that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance. See 34 Cyc. 1800; Tones v. State, 48 Tex. Cr. 363, 88 S. W. Rep. 217, 122 Am. St. Rep. 759, 1 L. R. A. (N. S.) 1024.

Violence need not be actual to constitute the offense of robbery. It is robbery to create in the person to be despoiled a reasonable apprehension of violence to avoid which he parts with the thing. An assault which has not traveled to a battery, or probably any such array of force as is calculated to create the reasonable apprehension though short of a technical assault suffices. The menace must be of a sort to excite reasonable apprehension of danger. Threat of prosecution for a crime is generally regarded as insufficient to create fear upon the theory that a man in the hands of the law is not legally presumed to be in danger of bodily harm. The one exception grafted upon the doctrine by the English cases is a threat to bring against the victim the charge of sodomy. But says Mr. Bishop there is clearly no foundation of principle for the exception. It is an excrescence on the law. 2 Bishop's New Criminal Law 674-675.

"But where one falsely pretended to have official authority and thereon seized another, shoved him against a wall, and threatened to take him to jail unless he paid the demanded money, this actual violence elevated the taking of the money to robbery." 2 Bishop's New Criminal Law 676; Bussey v. State, 71 Ga. 100; McCormick v. State, 26 Tex. App. 678, 9 S. W. Rep. 277; 23 R. C. L. 1148; Williams v. State 51 Neb. 711, 71 N. W. Rep. 729.

And in 2 East's Pleas of the Crown 709 a case is recorded where a man carrying cheeses along the highway in a cart was stopped by one Hall, who insisted on seizing them for

a want of a permit, which was a mere pretense. On some altercation the owner and Hall agreed to go before a magistrate to determine the matter. In the meantime other persons in confederacy with Hall for the purpose carried away the goods in the owner's absence, no force was used. Judge Hewitt left the matter to the jury who found it robbery and found a verdict for the owner against the hundred of Chippenham on the statutes of hue and cry. The court of King's Bench was of the same opinion.

In a note to the case by the author, the opinion is expressed that the decision was grounded on the consideration that the first seizure of the cart and goods by Hall being by violence and while the owner was present constituted the offense robbery.

As for taking by force, it may be either actual or constructive. Constructive force is anything which produces fear sufficient to suspend the power of resistance and prevent the free exercise of the will. See Note 57 L. R. A. 447-VIII Resume.

The evidence in the case was quite sufficient to support the charge of robbery upon either of two methods by which it was charged to have been submitted.

There was an assault upon the victim and a violent or forceful taking of possession of the automobile which he was driving and he was not permitted to depart until he paid the defendants the money they demanded. There were threats of a prosecution for an alleged crime following the assault and forceful detention of the victim sufficient to overcome his resistance and prevent the exercise of his will. There was intimidation through threats of prosecution inducing on the part of the victim fear of personal harm. There was false pretension on the part of defendants to

official authority and under such pretense they assaulted Lamacks, took the ignition key out of his car thus preventing him from pursuing his journey and forcefully detaining him and threatened to arrest him and take him before a magistrate. Under these circumstances he surrendered the money to them which they demanded under the fear of bodily injury if he refused.

Lamacks was traveling through the country in an automobile. The engine became hot and he stopped his car to allow it time to cool. While waiting for his car to cool he fell asleep. The defendants seeing the man asleep crossed the road to where he was. Montsdoca "grabbed" Lamacks by both shoulders and shook him and ordered him to get out of the car. Tracy took the key from the switch board. They told him that they had him under arrest. That Montsdoca was an officer and would take Lamacks before the Judge but if Lamacks would pay one hundred dollars they would let him go. The victim of this assault testified that he was in fear, that he did not know what the two men would do to him and in that fear delivered the money to them.

In any case the money was obtained after the assault upon the victim and forceful taking possession of his car by removing the key switch and ordering the man to get out.

There was some slight variation in Lamack's testimony from that which he gave soon after the occurrence at the preliminary hearing but the variations were slight and unimportant. The jury had the witnesses before them and had the opportunity of observing their conduct upon the stand and were doubtless better qualified to reconcile apparent inconsistencies in the evidence than we whose function it is to read the written word, after it has been spoken

by the witness and recorded upon paper by stenographic marks and signs which must yet be transcribed and interpreted by the stenographer before they reach here.

Robert Montsdoca testified in his own behalf. His account of the transaction was different from that given by Lamacks. There was no categorical denial by him however that he got the money from Lamacks and kept it. There was an inferential denial of that part of the transaction. He gave an account of the occurrence which he said was all that occurred. The account given by him did not contain a statement that he obtained any money from Lamacks.

We have examined the charges given by the court and find them to be a full, clear and correct, exposition of the law as applicable to the evidence in the case. The charges requested and refused were properly refused because some of them were erroneous because they undertook to interpret and give significance to certain facts which were sought to be established by the evidence and the others were fully covered by the general charge.

The record discloses no error in the trial. The defendants were ably represented by counsel, the trial was conducted without prejudices and the charge of the court fully presented the law applicable to the evidence. So the judgment is affirmed.

WHITFIELD AND WEST, J. J., concur.

BROWNE, C. J., dissenting.

Robert Montsdeoca was convicted of robbing W. H. Lamacks of $60.00 "by force, violence and assault and putting in fear," Montsdeoca not being then and there armed with a dangerous weapon."

Tracy was indicted and convicted as being "present, aiding, inciting, assisting and abetting the said Robert Montsdeoca."

It appears from the testimony that a man named Lemsecks, (possibly the same man who is named in the indictment "Lamacks") was driving through the country in a Ford car. He had a bottle with some "shine" in it, and had drunk about half of it. Sometime in the afternoon he drove his car a short way off the main road, stopped it and fell asleep. While asleep, the defendants and one Gabe White drove up in a car and stopped. Montsdeoca and Tracy got out, Montsdeoca saying, he "would go over and see what was the matter with that man and have some fun, or something like that." They took hold of Lemsecks by the shoulder or arm and woke him up.

He testified that when they wakened him, Montsdeoca "commanded" a little bit of shine that he had in the car.. Montsdeoca then said "he was an officer, and if he would give him $100.00 he would turn him loose." Lemsecks replied that he did not have $100.00, but he would give him a check, which he declined to accept. Lemsecks then took $60.00 in U. S. Currency from his pocket and handed it to Montsdeoca.

In his direct examination Lemsecks stated that he did not believe Montsdeoca was an officer, and was, therefore, not influenced by the threat of arrest.

At the preliminary hearing that was held a few days after the occurrence, he testified that he thought Montsdeoca was an officer, and his threats to arrest him influenced him in giving up his money. This was brought out on cross-examination as appears from the following excerpts: "Did or did you not at that time and place in

answer to this question, give the following answer? How did you come to give them that money Mr. Lemsecks? and you answered A. He claimed he had me under arrest and would turn me loose if I would give him the money. Were you influenced by that to think he had the right to arrest you? A. Yes, I did not know who he was. Q. Did you give those answers? A. Yes. A. Did you further answer Q. What did you think they were arresting you for? That shine in your car? A. Yes. A. Yes.

"Q. Did you say you would not like him to take you before the judge or words to that effect? A. I don't remember exactly whether I did or not. A. Your memory was fresher then than now? A. Yes. Q. Would you say you did not answer the question this way; Q. Who woke you up? A. Montsdeoca. Q. What did he do to you? A. He said he was an officer and had me under arrest and would take me before the Judge and I said I would not like to do that and he said if I would give him $100.00 he would turn me loose. Q. Is that right? A. Yes, that is it. Q. How did you say he woke you up? A. Caught me by the shoulders and shook me. Q. Both shoulders? A. Yes. Did you in answer to this question at that preliminary hearing give this answer, 'What did he say to you to wake you up? A. He came up and shook my arm. Q. Did you so answer at that time? A. He took me by the shoulders and arms this way (Indicating)."

" 'What was it that caused you to turn over to them your money and your watermelons? Answer: He claimed to have me under arrest. Did you answer that way? A. Yes. Q. And then 'And it was because of your fear of having your liberty restrained that caused you to part with your property,' and did you answer that question 'Yes sir?' A. Yes."

The Justice of the Peace before whom the preliminary examination was held, testified as follows: "Q. I will ask you this question: Was the following question asked at that preliminary hearing, to which Mr. Lemsecks answered as follows: 'How did you come to give them that money Mr. Lemsecks?' And his answer was 'He claimed that he had me under arrest and would turn me loose if I gave him the money,' Q. Is that the answer, that you understood him to give in answer to that question? A. It is."

"Q. Then in answer to this question, will you say that the following is the answer he gave "Were you influenced by that statement that he had a right to arrest you,' and his answer was 'Yes I did not know who he was? A. Yes he made that answer to that question."

"Q. And was not this question asked, to which he answered as follows: Q. 'What did he do to you,' He said he was an officer and said he had me under arrest and said he was going to take me before the Judge and I said I would not like for him to do that and he said if I would give him $100.00 he would turn me loose? A. Yes I remember positive he made that statement. Q. Was not this question also asked 'What did he do to you to wake you up' A. 'He came up and shook my Arm?' A. Yes I think he did. Q. Your notes show that statement was made? A. Yes. Q. State whether or not the following question was given at that time and whether or not the following is not his answer to same. 'Q. Did he put the switch key in before you give up the $60.00?' and his answer, 'He put it in about a minute before I handed over the sixty dollars?' A. Yes."

Lamacks testified that the $60.00 was in his pockets, and he "took it out and handed it to them."

In answer to this leading question by the State Attorney, "State to the jury whether or not you were in bodily fear at that time," he answered: "Yes, I was." And on cross examination he said: "I certainly was in fear;" and on being asked if "that was fear of being arrested for having moonshine in your possession," he replied, "And also I did not know what they would do to me."

The picture that the testimony presents, shows Lamacks asleep in his car about one hundred yards off the brick road. Three men drive up and see him, and one proposes to "go over and see what is the matter with that man, and have some fun." Two of them get out and go to the car, and one takes him by the arm or shoulder and shakes him to awaken him; they discover he has "shine" in his car, and they represent themselves as officers of the law, and tell him they have him under arrest, but they will turn him loose if he gives them $100.00. He offers to give them a check, which they decline; he then takes $60.00 out of his pocket and hands it to one of them.

Lemsecks testified that Tracey taking the switch key out of the car, but he put it back. He testified on the preliminary hearing that Tracey placed it back before he gave them the money, but on the trial he says it was afterwards.

His testimony, however, on another point, supports the statement that Tracey put the key back before the money was handed to Montsdeoca. He testified that 'after he told Tracey who he was, he tried to get Montsdeoca to let him go.' "He said it two or three times." The prosecutor seemed desirous of exonerating Tracey, and in several places in his testimony he repeats that Tracey tried to get Montsdeoca to let him go. Just how that could be done, if Tracey still had the key, he does not attempt to explain,

and the conclusion is that the key had been put back before the money was handed over. Montsdeoca testified, ''Q. You would not say Tracey said let him go, before you parted with your property would you? A. Yes, he said let him go. Q. Before you turned over anything? A. Yes.''

Taking this switch key from the car, the majority of the court holds to be a ''violent and forceful taking possession of the automobile.'' Even if at best, the taking of the switch key, was a constructive ''taking possession of the car,'' the only force used, was such as would be necessary to remove this little key from the lock. Hardly ''violent.''

The question involved is whether Lamacks took the money out of his pocket and gave it to Montsdeoca through fear of being arrested for having moonshine in his possession, or whether he did it through fear of personal injury or bodily harm, induced by such words, gestures or manner of the defendant or either of them, as in common experience would be ''likely to create an apprehension of danger and induce one to part with his property for the safety of his person.'' Simmons v. State, 41 Fla. 316, 25 South Rep. 881.

If the former, it would not be robbery under the common law, or under the law laid down by this court.

In the Simmons case, *supra*, this court said : ''The statute does not define what circumstances shall constitute 'putting in fear', but this expression is evidently used in a technical sense, and we must ascertain its meaning by reference to the common law definition of robbery from whence it is derived. Turner vs. State, 1 Ohio St. 432; Clary v. State, 33 Ark. 561. At common law robbery was 'the felonious and forcible taking of property of another from his person or in his presence, against his will, by violence or by putting in fear.' I Wharton's Crim. Law, Sec. 846; 2 Russell on

Crimes (9th ed.) *98. The putting in fear, or intimidation, was considered the equivalent of constructive violence, and the demands of the law were met by proof of fear excited with respect to apprehend injuries to the person, property or character. 2 Russell on Crimes (9th ed.) 113. Though there need be no great degree of terror or affright for personal safety excited in the person robbed, the fact must be attended with such circumstances of terror or intimidation, such threatening by word, gesture or manner, as in common experience are likely to create an apprehension of danger and induce one to part with his property for the safety of his person. 2 Russell on Crimes, *113; I Hawkins Pleas of the Crown (8th ed.) 128. The terror which would lead the person robbed to apprehend an injury to his character was never deemed sufficient to support an indictment for robbery except in the particular instance of its being excited by means of insinuations against, or threats to destroy, the character by accusations of sodomitical practices. 2 Russell on Crimes (9th ed.) *118; 1 Wharton's Crim. Law, Sec. 852; 2 Bishop's New Crim. Law, Sec. 1173.''

There were no threats to do personal injury or bodily harm to Lemsecks by either of these parties. He says he was in ''bodily fear,'' but there are no circumstances shown; no ''word, gesture or manner'' by either of these parties, ''likely to create an apprehension of danger and induce one to part with his property for the safety of his person.''

He attempts to justify what he calls his ''bodily fear,'' by adding ''and I did not know what they would do to me.''

The fear contemplated by the statute and described by Mr. Justice CARTER, in Simmons v. State, *supra*, must arise from words or actions on the part of the supposed

robbers, and not his lack of knowledge of "what might be done to him.

If not knowing what a person might do, were sufficient to arouse the fear that is an essential element in robbery, any beggar who gets a dole from his benefactor, could be convicted of this crime, because the person who gave him the money could truthfully swear that he did not know what the beggar "might do to him," if he refused.

In the case under consideration, there were no menaces, no threatening words or acts, nor were there such circumstances of terror or intimidation, as would induce a person to part with his property for the safety of his person, other than the fear of arrest for violating the prohibition laws.

Obtaining money from another under threats to circulate reports against the character of the victim is not robbery, unless the threats relate to sodomitical practices.

In making this exception, the law recognizes that certain things may be so atrocious as to make them out of the general rule.

The courts have not yet said that personating a prohibition officer for the purpose of extorting money from another, will take the act out of the general class of threats of arrest, but the evil is a growing one, and it may increase to a degree that will require them to differentiate this class of threats from ordinary threats of arrest, and to put the taking of money or other property from a person under threat of arrest for violation of prohibition laws, within the purview of the statute.

There being no testimony competent to establish that the money was obtained from Lemsecks by threatening acts, words or gestures, such as would have caused him to appre-

hend personal injury at the hands of the defendant, I think the judgment should be reversed.

TAYLOR, J., concurs.