**UNITED STATES v. KEMBLE et al.**

Nos. 10422, 10423.

United States Court of Appeals
Third Circuit.

Argued April 21, 1952.

Decided Sept. 4, 1952.

McLaughlin and Staley, Circuit Judges, dissented, and Biggs, Chief Judge, dissented in part.

William A. Gray, Philadelphia, Pa. (Albert K. Plone, Camden, N. J., Lester J. Schaffer, Philadelphia, Pa., Gray, Anderson, Schaffer & Rome, Philadelphia, Pa., on the brief), for appellants.

Grover C. Richman, Jr., Newark, N. J. (Stanley E. Rutkowski, Asst. U. S. Atty., Stuart B. Rounds, Asst. U. S. Atty., Trenton, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This appeal presents important questions of the construction and application of the Act of July 3, 1946,[1] the so-called

---

1. 60 Stat. 420, 18 U.S.C. § 420d (1946 ed.). In 1948, between the occurrence of the offence here charged and the indictment, this statute was superseded and its substance reenacted without consequential change as Section 1951 of the new Title

Hobbs Act, which makes it a crime against the United States to engage in acts of violence designed to obstruct commerce by extortion. An indictment under Section 5 [2] of the statute charged Truck Drivers and Helpers Union, Local 676, and Aaron Kemble, one of its business agents, with acts of violence against one Elwood Leonard and property in his possession, pursuant to their "plan and purpose to obstruct, delay and affect commerce and the movement of certain articles and commodities in commerce by extortion". The defendants were tried together and both were convicted. Kemble was sentenced to two years imprisonment and the union was placed on probation for three years. Both have appealed.

The evidence showed that Leonard, a truck driver employed by Doehler-Jarvis Corporation of Pottstown, Pennsylvania, transported a shipment of merchandise by motor truck from the Pottstown plant of his employer to Camden, New Jersey, where he attempted to make delivery of part of the merchandise at the RCA-Victor plant before proceeding elsewhere. Leonard had unloaded most of the RCA consignment when Kemble interposed. There is adequate proof that Kemble, after ascertaining that Leonard was not a member of or cleared by Kemble's union, stopped Leonard from unloading the interstate shipment and employed actual and threatened violence against Leonard and the property in his possession.

The evidence of Kemble's purpose was supplied by the truck driver Leonard himself and by Earle Lafferty who was receiving the shipment for the consignee as it was unloaded by Leonard. Lafferty testified as follows:

"* * * he [Kemble] asked for a union card or book, and the man [Leonard] didn't have any, and he said, You will have to have a helper from the local unload the truck, and there would be a day's wages for a man which was $10.00."

The driver, Leonard, testified to the same effect:

"He [Kemble] told me that I had to put a union man on the truck to unload. I said 'What for?' He said 'Because the union rules it.' I said 'I don't believe so. We are delivering our own stuff and the union rules say we can.' He said 'You will have to hire another man.' I forget offhand what it was. It was in the neighborhood of $10. I said 'I am not authorized to pay him * * *.'"

The defendants offered no proof or rebuttal whatever. Thus, on the issue of purpose it was reasonable for the jury to conclude that Kemble, understanding that Leonard did not want or need a helper and was not authorized to employ one, nevertheless forcibly insisted that Leonard pay $10, described as a day's wages, for a supernumerary to do what Leonard himself was paid to do and was accomplishing when Kemble intervened.

■ Is violence with such design within the statutory meaning of extortion defined in the Hobbs Act as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force * * *"? [3] More narrowly, is the payment which Kemble tried to compel such a levy of tribute as amounts to forceful "obtaining of property from another"? Or, does analysis of the at-

---

18 of the United States Code. However, such a prosecution as this. Act of June a saving clause in the repealer permitted 25, 1948, c. 645, Sec. 21, 62 Stat. 862, 18 U.S.C.A. note preceding section 1.

2. "Sec. 5. Whoever commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of section 2 shall be guilty of a felony."

Section 2 provides:

"Whoever in any way or degree obstructs, delays, or affects commerce, or the movement of any article or commodity in commerce, by robbery or extortion, shall be guilty of a felony."

3. "Sec. 1. As used in this title—
* * * * *
"(c) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

tempted transaction as an exchange of wages for services, albeit a forced payment for and a forced acceptance of services, establish the absence of some essential of Hobbs Act extortion?

Certainly, as a matter of semantics, the quoted words of the statute, "obtaining of property from another", are broad enough to cover Kemble's objective. And an examination of the legislative history of the statute convinces us that Congress intended such comprehensive coverage.

Both the original "Anti-Racketeering Act" of 1934, 48 Stat. 979, and the amendatory reenactment of 1946, 60 Stat. 420, which controls the present indictments, are criminal sanctions directed against interference with interstate commerce by coercive conduct in the nature of extortion. Within this area the original Act proscribed, among other things, the use of threats or force to obtain, "the payment of money * * * not including, however, the payment of wages by a bona-fide employer to a bona-fide employee". 48 Stat. 979, 980. The construction of this exception became a problem for the courts. In United States v. Local 807, 1942, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004, the Supreme Court analyzed this exception in considerable detail. One of its conclusions was that " * * * an outsider who 'attempts' unsuccessfully by violent means to achieve the status of an employee and to secure wages for services falls within the exception. And where * * * the offense charged is conspiracy to violate the section, the defendants are entitled to immunity if their objective is to become bona fide employees and to obtain wages in that capacity, even though they may fail of their purpose". 315 U.S. at page 531, 62 S.Ct. at page 646, 86 L.Ed. 1004.

In 1945, the House Committee on the Judiciary reported the bill which became the 1946 revision of the statute. Beyond formal reorganization and improvements in language the principal change accomplished by the new bill was the elimination of the exception the effect of which had been stated in the Local 807 case. More particularly, the 1946 reenactment covered interference with interstate commerce by ac-

tual or attempted "extortion" and defined "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force * * *." But, different from the original statute no exception was made for cases where the property involved should be money demanded to be paid in the form of wages. This change was deliberate. The committee report shows that Congress had the original exception and its effect foremost in mind, for that report sets forth in full text the Supreme Court opinion in United States v. Local 807 construing the controversial exception, and little else. And throughout the ensuing debate on the House floor, proponents of the bill talked principally about the undesirable narrowing of the original statute which had resulted from judicial construction of the exception. 91 Cong.Rec. 11899–11922 (1945). The debate was opened for the proponents of the bill with an explanatory statement by Congressman Hancock that "This bill is designed simply to prevent both union members and nonunion people from making use of robbery and extortion under the guise of obtaining wages in the obstruction of interstate commerce." 91 Cong.Rec. 11900. Speaker after speaker expressed essentially the same view of the purpose and effect of the bill. Equally instructive was the effort of Congressman Celler to amend the bill from the floor by inserting a stipulation that extorted property should not include "wages paid by a bona-fide employer to a bona-fide employee". 91 Cong. Rec. 11913–11917. Not only was this amendment defeated but the debate on it made clear the prevailing view that such solicitude toward the forced payment of wages would destroy the principal intended effect of the bill and preserve the strictures of the Local 807 case.

In these circumstances, the conclusion seems inescapable that Congress intended that the language used in the 1946 statute be broad enough to include, in proper cases, the forced payment of wages. We say "in proper cases" advisedly. For it is not necessary that we here consider the great variety of circumstances in which coercion may be involved in the payment of wages.

We need not consider the normal demand for wages as compensation for services desired by or valuable to the employer. It is enough for this case, and all we decide, that payment of money for imposed, unwanted and superfluous services such as the evidence shows Kemble attempted to enforce here by violent obstruction of commerce is within the language and intendment of the statute.

A final observation on this phase of the case. We have considered that the original "Anti-Racketeering" Act expressly preserves "the rights of bona-fide labor organizations lawfully carrying out the legitimate objects thereof * * *", and that by fair inference the Hobbs Act does the same thing. But the word "lawfully" is an important limitation. It is all important here since no federal or state sanction makes Kemble's violent conduct lawful.

This disposes of the principal contention of Kemble. He has advanced others concerning the admission of evidence and the content of the prosecutor's summation. We are not persuaded that any of these contentions is well founded. We find no error in the conviction of Kemble.

The case against the union involves the additional question whether the organization was criminally responsible for Kemble's acts. Proof of responsibility had to meet a statutory standard imposed by Section 6 of the Norris-LaGuardia Act, 29 U.S.C.A. § 106, as recently construed by the Supreme Court in United Brotherhood of Carpenters and Joiners of America v. United States, 1947, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973.

■ It is not disputed that Section 6 of the Norris-LaGuardia Act applies to proceedings under the Hobbs Act.[4] And Section 6 provides that neither an individual nor a labor organization can "be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowl-

edge thereof". In the Carpenters case, the Supreme Court reasoned that under the quoted language liability may not be predicated on a showing which would satisfy merely the requirements of the tort doctrine of *respondeat superior* or even the stricter normal criminal law doctrine which defines the area of "corporate criminal responsibility for the acts of officers and agents in the course or scope of employment". Beyond both of these there must be "clear proof that the particular act charged, or act generally of that type and quality, had been expressly authorized, or necessarily followed from a granted authority * * * or was subsequently ratified by [the] association * * * after actual knowledge of its occurrence." 330 U.S. at 406–407, 67 S.Ct. 781, 91 L.Ed. 973.

It is noteworthy that the Court did not deal with "participation" by the labor organization as a category distinct from "authorization" or "ratification". The reason seems clear. In the Carpenters case, as in this case, an organization was indicted solely on the basis of acts of its agents. No effort was made to show any "participation" of the organization except insofar as acts of agents may have been authorized. Thus, demonstration that there was no sufficient proof of union "authorization" by the same token negatived union "participation". Any different result would have required the invocation of fiction which has no proper place in the imposition of punishment.

There was a dissent in the Carpenters case. The dissenting Justices pointed out that, under the Court's construction of Section 6, responsibility of a union for acts of its officers or members would be limited for all practical purposes to cases where the wrongdoing in question or similar wrongdoing had been authorized or approved by vote at a union meeting or some equally clear manifestation of group will. The dissenting Justices seem to have believed that such doctrine as normally limits criminal responsibility for acts of agents, applied in conjunction with the normal requirement of proof of each essential element of a

---

4. The Hobbs Act itself reaffirms Section 6 of the Norris-LaGuardia Act and declares that it is in no way modified. 60 Stat. 420, 421.

crime beyond reasonable doubt, would satisfy the provisions of the Norris-LaGuardia Act.

But we must take the law as the Supreme Court finds it. For our purposes the dissent in the Carpenters case but emphasizes the stringency of the rule we are required to follow. This strict rule precludes a conviction here.

In the view most favorable to the prosecution, the evidence in this case showed merely that the wrongdoer was a business agent of the union; that he was charged by the union with responsibility for checking upon and making appropriate representations about the union status of persons unloading trucks; that four other unidentified persons participated with him in the wrongdoing in question; and that at the scene of the wrongdoing, a few minutes after its occurrence, the secretary-treasurer of the union threatened similar "trouble" for another employer if it should "not live up to the union contract". There was no other evidence tending in any way to show relationship between the union and the violence of its business agent.

As concerns ratification, it does not even appear how, when or whether the union was informed of its agent's misconduct. It is obvious that the threat by the secretary-treasurer a few minutes after the wrongful act was no clear proof, if proof at all, of approval of wrongdoing by the organization.

█ The case for prior authorization is no better. Only by invoking the tort conception of *respondeat superior* can the proof of the business agent's office and duties have been made a basis of union responsibility. At most it can be said that in an effort to accomplish a lawful mission assigned by the union the business agent acted in an unlawful way not required by his mission and not shown to have been authorized by his principal. The case is essentially like that where an employee, instructed merely to collect a bill, assaults a non-paying debtor. Principles of civil liability may permit the imposition of responsibility on the employer who has in no way assented to the wrong. Son v. Hartford Ice Cream Co., 1925, 102 Conn. 696, 129 A. 778. But cf., Martin v. Curran, 1951, 303 N.Y. 276, 101 N.E.2d 683. However, even normal criminal responsibility does not extend that far. In this regard, the criminal law doctrine is so well settled that its exposition in contemporary judicial opinions is rare. However, some years ago in Nobile v. United States, 3 Cir., 1922, 284 F. 253, 255, this court did have occasion to point out that "Criminal liability of a principal or master for the act of his agent or servant does not extend so far as his civil liability. He cannot be held criminally for the acts of his agent, contrary to his orders, and without authority, express or implied, merely because it is in the course of his business and within the scope of the agent's employment, though he might be liable civilly." See also United States v. Food and Grocery Bureau, D.C., S.D.Cal., 1942, 43 F.Supp. 966, 971.

It follows that the evidence here does not meet even the standard which the Justices dissenting in the Carpenters case would have imposed. The added stricture of the prevailing construction of the Norris-LaGuardia Act is not needed to establish the failure of proof in this case. But it does serve to make that failure clear beyond doubt. Moreover, this special requirement of "clear proof of * * * actual authorization" makes it noteworthy that the district judge in sentencing the union remarked that the question "Whether or not the union ratified or directed this act on the part of Kemble and O'Neall was from the factual standpoint a close one." And the United States Attorney who argued this appeal conceded with commendable candor and objectivity that the evidence against the union was not particularly strong. Of course, we are not bound by these impressions of others. But they confirm our conviction that the case against the union contained no "clear proof of * * * actual authorization".

In appeal No. 10,422 the judgment and sentence will be affirmed. In appeal No. 10,423, the judgment will be reversed and the cause remanded to the district court with direction to enter a judgment of acquittal.

McLAUGHLIN, Circuit Judge (dissenting).

The proposition presented by the particular facts before us and which cannot be watered down is whether the attempted unionization of a trucking corporation by a bona fide labor organization, which had for its sole objective the employment of a qualified union helper to unload the truck at the platform of a corporation having a closed shop agreement with the union, and which was accompanied by violence, is within the scope of the Hobbs Act of 1946 which is the successor of the original Federal Anti-Racketeering Act of 1934. This is unqualifiedly a labor dispute in which the union was participating or interested as is shown by the insistence of the majority opinion on the quality of proof as to the union, which of course is applicable only in a labor dispute. Section 6, Norris-LaGuardia Act. There is nothing in this case to justify the statement that the defendant Kemble tried to compel payment from the trucking company. Kemble's entire purpose, as far as this record goes, was to obtain the employment of a competent union helper by the trucker [5] to do the unloading. This is not a question of degree or semantics. There is no inference fairly or unfairly permissible from the facts that the union or Kemble was at all interested in the trucking company paying protection money. The Government concedes this and faced the issue squarely both at the trial [6] and on appeal. Its complete position as is that of the court majority is that, even though the purpose of the defendants was as above outlined, because violence did ensue Congress has decreed them guilty of racketeering under the Hobbs Act by, as is said in the Government brief, " * * *

simply omitting the exclusionary provisions in the amended Act."

From the scant facts it is inferable that the defendant union had a contract with RCA-Victor whereby the unloading of deliveries to the latter's Camden plant was to be performed by members of that union. The contract was not in evidence. That there was some such agreement appears from the Government testimony and is not contradicted. The defense rested without affirmatively presenting any evidence, relying on its motion for acquittal. Defendant Kemble, it will be recalled, was the union's business agent. The evidence at most showed that the defendants sought to induce Doehler-Jarvis Corporation, a trucking concern, to hire a member of the union as a helper to take care of that company's unloading of its delivery at RCA and that in the course of the episode there was a threat or threats by Kemble and also that the air was let out of the front tires of the truck involved.

Admittedly, for the defendants to be convicted under the indictment they must have been shown to have been guilty of planning to obtain the property of the trucking corporation with its " * * * consent induced by wrongful use of actual or threatened force, violence or fear * * *." The majority opinion flatly states that because there was evidence of violence and threats and because the 1946 law does not contain the exception that appeared in the 1934 Act regarding payment of wages by a bona fide employer to a bona fide employee, Kemble is guilty under the Hobbs Act indictment against him. The sole reason for this holding is the legislative history of that Act. The proposed anti-racketeering legislation which later resulted in the Hobbs Act

5. See the evidence of Kemble's purpose quoted in the majority opinion. In addition, Lafferty testified that "Mr. Kemble wanted him [the truck driver] to go down to the local and get a local man, a helper to unload the truck, * * *." An F.B.I. agent testified that "Kemble said that he told the driver that he could not unload without a union book because it was a closed shop at RCA, * * *. He said that they have a lot of trouble with the Doehler-Jarvis trucks because they were non-union and were trying to unload without union help."

6. The District Attorney, in concluding the opening remarks of his summation, said to the jury: "How many of you would get away with it if you went to a truck driver who came, even in to your private place of business, and *you threatened to beat him up if he didn't hire somebody you wanted him to hire to unload a truck?*" (Emphasis supplied).

did come before Congress in 1945 because of the then recent Supreme Court decision in United States v. Local 807, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004. But the main interest of the Congress in that opinion was not in the conclusion of the Court to the effect that if the objective was to become bona fide employees and to obtain wages in that capacity, even if accompanied by violence, the objective was within the exception to the 1934 Act. The Government had frankly and categorically admitted in that matter that *"Those who use coercion to secure genuine employment are engaged in a legitimate labor objective; their activities, although perhaps constituting breaches of the peace, do not partake of the nature of extortion."* (Emphasis supplied.) United States v. Local 807, supra, 315 U.S. at page 522. The real quarrel of Congress with the decision was that the Supreme Court had also held within the exception the situation where the services were tendered in good faith and rejected and the union still required an employer to pay the equivalent of the prevailing union wage. The Government had argued in the 807 litigation that such payment was to be classed as a payment for protection rather than for services and was to be grouped with payments where the unions did not offer to work or actually refused to work. With the above in mind the statement of Congressman Hancock quoted in the majority opinion becomes readily understandable and clearly indicates that what he and the other members of Congress were disturbed about was the always vicious practice of compelling protection payments which had again raised its ugly head.

The Supreme Court in the Local 807 opinion had no occasion to and did not pass upon the problem confronting us, namely, whether, absent the 1934 Act exception, the present situation is to be construed as violative of the federal anti-racketeering statute or specifically, is it a plan or purpose to extort the property of the trucking company. In the 807 decision the Supreme Court of necessity considered, construed and applied the exception to the statute which at that time existed. But there is not the slightest suggestion in the opinion that without the exception the court would have held the present facts within the 1934 federal law. Indeed, carefully reading that decision, the definite impression conveyed is to the contrary.

Admittedly the Hobbs Act is just as exclusionary of legitimate labor objectives as was the 1934 law. See Title II of the Hobbs Act. 60 Stat. 420. The original Act, even without its exception, did not pretend to characterize such an objective as the instant one, though accompanied by violence, as attempted extortion. Unquestionably the exception did specifically eliminate from the scope of the 1934 Act the payment of wages by a bona fide employer to a bona fide employee. That provision was inserted in an excess of caution because it was feared that without it serious injury to labor might result. United States v. Local 807, supra, 315 U.S. at page 529, 62 S.Ct. 642, 86 L.Ed. 1004. However, the statute itself was never intended to cover the conceded situation before us for it was aimed directly at " * * * the elimination of terroristic activities by professional gangsters * * *." United States v. Local 807, supra, 315 U.S. at page 530, 62 S.Ct. at page 646, 86 L.Ed. 1004. The Supreme Court in that same opinion quotes the Senate report on the legislation pending at that time which states its purpose to be " * * * to close gaps in existing Federal laws and to render more difficult the activities of predatory criminal gangsters of the Kelly and Dillinger types." [7]

We are dealing with a problem peculiar to labor. It is important to have in mind that it arose prior to the Taft-Hartley statute, 29 U.S.C.A. § 141 et seq., where for-the first time Congress imposed sanctions upon unfair labor practices by unions. It arose from a reputable union's genuine attempt to organize a trucking corporation. The sole purpose of the defendants was to procure work for capable union men. The employment sought was neither spurious nor superfluous. In this instance it was only because the driver of the truck was not a

---

7. See S.Rep.No.1440, 73d Congress, Second Session.

member of the union that the question of a union helper arose at all. The Hobbs Act as it stands is obviously a general Federal criminal statute directed to a certain class of crimes known as racketeering. Its history and that of its predecessor show a real need for that type of Federal legislation. Its purpose is clear. Its definition of extortion is free from ambiguity. That definition does not include the bona fide seeking of employment on behalf of a union despite possible violence in connection therewith. That was the effort in this occurrence and that kind of effort was never blackmail, and it is blackmail at which the Hobbs Act is directed. If Congress had finally desired the instant circumstances to be covered it could readily have widened the conditioned impact of the statute. We have no power to do so. The majority opinion designates the sought for unionization of this trucking company as an extortive effort to impose unnecessary services upon that employer. When Congress wished to prevent that sort of coercion in the Lea Act (which has to do with "Coercive practices affecting broadcasting; * * *") it carefully so stated, 47 U.S.C.A. § 506(a) (1), (2), (3), (4), and made a violation punishable by imprisonment for not more than one year, Section 506(d). The maximum prison term upon conviction of a Hobbs Act transgression is twenty years. Common sense repels the conclusion that Congress would have a teamster face a possible twenty year prison term for that type of offense which if committed by a musician would result in a sentence of not more than one year. When the musicians union challenged the constitutionality of the section of the Lea Act forbidding the use of force, violence, etc. to coerce a licensee to employ any person in excess of the number of employees needed to perform actual services, the union *inter alia* argued that the section violated due process " * * * because it singles out broadcasting employees for regulation while leaving other classes of employees free to engage in the very practices forbidden to radio workers." United States v. Petrillo, 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877. If the Hobbs Act is to be construed

as interpreted by the majority opinion it is strange to find that the Supreme Court in June 1947 did not make use of what would have been a ready answer to such claim, namely, that Congress, to the limit of its constitutional power over interstate commerce, had by the Hobbs Act forbidden those practices to all workers. Instead of so replying what the Court did say was, "But it is not within our province to say that because Congress has prohibited some practices within its power to prohibit, it must prohibit all within its power." Ibid.

The above construction does not mean that the Hobbs Act condones violence just as long as the violence is connected with a legitimate goal. It means rather that under those facts the violence or other misconduct is left to state supervision as it should be. As the Supreme Court said in the Local 807 opinion, 315 U.S. at page 536, 62 S.Ct. at page 648, 86 L.Ed. 1004, "The power of state and local authorities to punish * * * violence is beyond question. It is not diminished or affected by the circumstance that the violence may be the outgrowth of a labor dispute. The use of violence disclosed by this record is plainly subject to the ordinary criminal law."

I would therefore reverse the judgments of conviction as to both defendants.

While I do not think the Government has made out a case within the Hobbs Act against the defendants, I do think the proofs satisfy the requirement of the Norris-LaGuardia Act with reference to the union's responsibility for Kemble's acts and conduct. Under those proofs if a violation of the Hobbs Act had been established the trial court would have been justified in submitting the indictment of the union to the jury. In other words, there was in evidence the needed "clear proof" that the union actually participated in or authorized what Kemble did and said and what happened under his direction. Section 6 of the Norris-LaGuardia Act, as construed by the Supreme Court in United Brotherhood of Carpenters and Joiners of America v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973, does not impose practically unrealizable conditions which must be met before a union may be held to liability. The

majority opinion in that matter, 330 U.S. at page 409, 67 S.Ct. at page 783, 91 L.Ed. 973, was careful to say that, "There is no implication in what we have said that an association or organization in circumstances covered by § 6 must give explicit authority to its officers or agents to violate in a labor controversy the Sherman Act [15 U.S. C.A. §§ 1–7, 15 note] or any other law or to give antecedent approval to any act that its officers may do. * * * And the custom or traditional practice of a particular union can also be a source of actual authorization of an officer to act for and bind the union." The proof called for by Section 6 need not be the equivalent of a union resolution to violate the Hobbs Act or convincing beyond any doubt.

The evidence below, including justifiable inferences from it, was sufficient to satisfy the ordinary intelligent conscientious juror of the union's authorization of and participation in Kemble's activities during the critical period. Section 6 of the Norris-LaGuardia Act requires no more than that.

STALEY, Circuit Judge (dissenting).

I concur in Judge McLAUGHLIN'S interpretation of the Hobbs Act. But I do not agree that defendants are entitled to a judgment of acquittal. On the basis of the record before us, I would reverse the judgments of conviction and grant both defendants a new trial.

The statute itself, viewed in the context of the criminal law generally, is clear. By resort to the apparent intent of Congress, the majority has injected into the Act a meaning which its language does not reasonably import. In so doing, they have cast aside the salutary rule that criminal statutes are to be strictly construed. See United States v. Resnick, 1936, 299 U.S. 207, 209, 57 S.Ct. 126, 81 L.Ed. 127.

The crucial issue, as I see it, is whether the intent to seek employment, even though accompanied by violence or threats of violence, is the kind of criminal state of mind Congress intended to punish under the Hobbs Act. At the outset we are confronted with the obvious problem that the Act itself sets forth no statement as to any requisite *mens rea*. According to the bare words of the statute, anyone who obtains property from another by the wrongful use of force, violence or fear in such a way as to obstruct commerce has committed a violation of the Act and is subject to a maximum penalty of twenty years' imprisonment. Apparently one would be guilty of a violation of the Act even if his only intent in wrongfully using force were to borrow property from another, so long as the act affected commerce. Suppose Kemble had demanded that Leonard lend him the truck for an hour so that Kemble could perform union duties. Would this have constituted a violation of the Hobbs Act?

The recent decision of the Supreme Court in Morissette v. United States, 1952, 342 U.S. 246, 72 S.Ct. 240, should control here. The defendant there was convicted of stealing government property in violation of Section 641 of the Criminal Code, 18 U.S.C. § 641. That statute, as the one before us here, omitted any mention of a requisite criminal intent. In reversing the judgment of conviction, the Supreme Court held that where Congress uses terms already well defined in the common law and statutory law of the states, it will be presumed to have intended that the courts apply the commonly accepted requirements with respect to criminal intent. "Absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." Morissette v. United States, supra, 342 U.S. at page 263, 72 S.Ct. 250. Since the Hobbs Act itself contains no indication that Congress intends to dispense with the traditional *mens rea* required in the crimes here involved, the command of the Morissette case seems clear.[8]

The legislative history of the bill only highlights the fact that Congress did not intend to create new statutory crimes, but was using the terms robbery and extortion in their generally accepted meaning in the

---

8. In United States v. Kemble, 3 Cir., 1952, 197 F.2d 316, this court followed the Morissette case in an opinion which emphasized the vital importance of an adequate charge on criminal intent. In the instant case no instruction whatever was given to the jury with respect to criminal intent.

criminal law. On this point Congressman Hobbs, author of the Act, had this to say: "They [the terms robbery and extortion] have been construed by the courts, not once, but a thousand times. The definitions in this bill are copied from the New York Code substantially."[9] 91 Cong.Rec. 11900 (1945).

All the larceny-type offenses have a basic similarity in that each involves a wrongful taking of property from another. Each is different, however, in that each concerns itself with a different method of taking. But all the larceny-type offenses require one additional ingredient—a criminal intent. See Morissette v. United States, supra, 342 U.S. at page 260–261, 72 S.Ct. 240. Larceny has been defined as the *fraudulent* taking and carrying away of a thing without claim of right, with the intention of converting it to a use of one other than the owner without his consent. 2 Wharton's Criminal Law § 1097 (12th ed.) Robbery has been defined as a felonious and forcible taking of the property of another from his person or in his presence, against his will, by violence or by putting him in fear. 2 Wharton's Criminal Law § 1083. At least one statute embodies the concept of a fraudulent taking in the definition of robbery. See Ga. Code. Annot. § 26–2501. A corrupt intent has been considered a necessary ingredient of common law extortion.[10] La Tour v. Stone, 1939, 139 Fla. 681, 693–695, 190 So. 704, 709–710.

Since the definitions of extortion and robbery were modeled after the definitions in the New York Code,[11] decisions of the New York courts construing those statutes, at least prior to 1946, should be of especial significance. The New York cases make it clear that a felonious intent is a requisite of both robbery[12] and extortion. Thus, defendants were held not to have violated the New York extortion statute in collecting union dues because they lacked the requisite felonious intent. People v. Gassman, 1943, 182 Misc. 878, 885–886, 45 N.Y.S.2d 709, 715, affirmed 1944, 268 App. Div. 377, 51 N.Y.S.2d 173, affirmed 1946, 295 N.Y. 254, 66 N.E.2d 705, 166 A.L.R. 154.

The instant convictions should not be allowed to stand unless the record shows evidence of a felonious intent—a corrupt, dishonest intent—an intent to defraud. Do those who seek employment in good faith for a reasonable wage have the requisite *mens rea?* I think not. Unfortunately, there do not appear to be any direct precedents in criminal law generally. Early English authorities are available, however, for the closely analogous situation of a forced sale of a commodity. Their view is that it is doubtful whether the offense of robbery is constituted where one, by threats of force, compels another to sell him goods in return for money equal in amount to the value of the goods. 4 Bl.Comm. § 243 (Lewis's ed.); 2 Wharton's Criminal Law § 1085. The English cases draw the distinction between a forced sale for a consideration less than the value of the goods and such a sale for a fair and adequate consideration. While the former situation is clearly robbery,[13] it is very much doubted whether the latter situation can be robbery. Hawkins, in his Pleas of the Crown, sums up this view in these words: " * * * and there seems to be no such enormity in the intention of the wrongdoer as is implied in the notion of felony." 1 Hawkins, Pleas of the Crown, Ch. 34, § 14, p. 236 (7th ed.) See also Archbold's Criminal Pleading 245

9. See also statement of Congressman Robsion. at 91 Cong.Rec. 11906 (1945).

10. Extortion at common law has been defined as an abuse of public justice which consists of the unlawful taking by an officer under color of his office any money or thing of value that is not due him, or more than is due him, or before it is due. 4 Bl.Comm. § 141 (Lewis's ed.)

11. See 91 Cong.Rec. 11900, 11906. The New York robbery statute is set forth at

39 McKinney's Consol.Laws of N.Y.Annot. c. 40, Penal Law, § 2120; the extortion statute is at id. § 850.

12. People v. Koerber, 1926, 244 N.Y. 147, 153–154, 155 N.E. 79, 82; People v. Garry, 1933, 237 App.Div. 769, 263 N.Y.S. 288.

13. Rex v. Simons, 2 East P.C. 712; Spenser's Case, Ibid.; Rex v. Lovell, L.R. 8 Q.B.Div. 185, 44 L.T.N.S. 319 (1881).

(4th American ed. from the 7th London ed).[14]

The fact that physical violence was threatened should not be allowed to confuse the picture. If Congress had enacted legislation making the obstruction of commerce by violence or threats of violence a crime, these defendants would properly stand convicted. But no such offenses were ever made into law; and this court should not judicially legislate such offenses. The felonious taking of property from another by the use of violence or threats of violence, whether it be denominated extortion or robbery,[15] is really a compound felony, for the actor has offended both the person and property of the victim. See 77 C.J.S., Robbery, § 1; 46 Am.Jur., Robbery, § 3; Montsdoca v. State, 1922, 84 Fla. 82, 86, 93 So. 157, 159, 27 A.L.R. 1291. If the actor offends only the person of his victim, a mere assault and battery has been committed. An offense against the property only would be a simple larceny. But if a defendant is to be convicted of the serious felony of engaging in violence or threats of violence in order to obtain the property of another, the prosecution should prove not only that the defendant had the intent to engage in violence or threats of violence, but also that he had a felonious intent with respect to the victim's property—a corrupt intent—a fraudulent intent. When we cast aside this second requisite, as does the majority, we, in effect, amend the statute before us from one designed to punish extortion and robbery affecting commerce to one punishing violence or threats of violence affecting commerce. This task is obviously for Congress—not the courts.

The instant convictions should be reversed because the jury, if properly instructed, could most certainly have found that defendants' only intent was to obtain gainful employment for a union man at a reasonable wage. The coercion of an employment relationship, unlike the defrauding of another of his property, is not an end that the law condemns.

The construction here adopted by the majority will have far-reaching effects on the rights of organized labor. A strike designed to force an employer to pay higher wages or employ additional workers is obviously designed to obtain money from the employer, even though the underlying intent can hardly be considered corrupt. Any sporadic outbreak of violence or threats of violence in connection with such strike might now be considered a violation of the Hobbs Act so long as interstate commerce is affected. A trifling assault thus becomes a serious felony punishable by imprisonment up to twenty years.

Any strike to obtain higher wages constitutes a use of force to obtain the property of another. Suppose an additional object of such a strike is to force the employer to bargain with a union when another labor organization has already been certified as the representative of the employees, thus rendering the strike an unfair labor practice. 61 Stat. 140, 29 U.S.C.A. § 158(b) (4) (C). Or suppose the strike is in violation of a collective bargaining agreement. These are both examples of strikes which are unlawful, at least in a certain sense.[16] Both might reasonably be termed attempts to obtain the property of another by the wrongful use of force. If such strikes

14. It is, of course, true that defendants were indicted for threatening to commit and committing physical violence in furtherance of a plan to obstruct commerce by extortion—not robbery. The dividing line between robbery and extortion, however, can be a very fine one. Where violence or the threat of violence is used, the question of consent or lack of consent becomes largely academic. In fact, at common law, the felonious taking of property from another by threats of physical violence was considered robbery, regardless of whether "consent" was obtained. See 2 Wharton's Criminal Law §

1093 (12th ed.). Hence, regardless of whether Kemble be charged with attempted extortion or attempted robbery, the weight of the English authorities cited above is not weakened.

15. See Note 7, supra.

16. No definition of "wrongful" is contained in the Hobbs Act. The Anti-Racketeering Act of 1934 contained the following definition: "Sec. 3. (a) As used in this Act the term 'wrongful' means in violation of the criminal laws of the United States or of any State or Territory." 48 Stat. 979, 980.

should affect interstate commerce, we would have complete offenses under the Hobbs Act.

I do not think that Congress intended such far-reaching effects under the Hobbs Act. Such results can be avoided if we interpret the Act as imposing on the prosecution the burden of proving a felonious, corrupt intent—an intent similar to that customarily required in all larceny-type offenses. Only such an interpretation is in harmony with the Morissette case.

I do not think the defendants are entitled to a judgment of acquittal for there was evidence from which a jury would have been warranted in finding that defendants did not in good faith seek employment. Whether the defendants did or did not seek employment was properly a question for the jury under proper instructions. The record reveals that Kemble approached Leonard at a time when the latter had only a few additional cartons to unload at R.C.A. Yet Kemble demanded that Leonard hire a man for a day at a wage of about $10. If Kemble made that demand knowing there were only a few minutes' work left, the jury would most certainly have been warranted in finding that Kemble did not in good faith seek employment for a union man but was boldly attempting to levy tribute from a non-union employer.

If the jury finds that defendants were not seeking employment in good faith, the dispute was not a labor dispute and Section 6 of the Norris-LaGuardia Act is rendered inapplicable. See 47 Stat. 71, 29 U.S.C.A. § 106; 47 Stat. 73, 29 U.S.C.A. § 113. A dispute between a would-be extortionist and his would-be victim can hardly be termed a labor dispute. With the stringent requirements of Section 6 removed, I think a jury would have been warranted in returning a verdict against defendant union.

I would reverse the convictions and grant defendants a new trial, for the trial court committed prejudicial and fundamental error in not instructing the jury as to the required mental state. Defendants' requested instruction No. 6 was a fair statement of the law; either it or an equivalent should have been granted.

BIGGS, Chief Judge (concurring in part, dissenting in part).

Perhaps the difference between my views and those of Judge McLAUGHLIN and Judge STALEY as well as those expressed in the majority opinion respecting the defendant Kemble can be best illustrated by propounding a series of questions and giving what I think would be the answers which the several opinions of the other judges of this court would require. This will also serve to highlight what I conceive to be the errors in the charge of the court below.

First, is this or is this not a labor dispute? Judge McLAUGHLIN would answer "Yes"; Judge STALEY would say "No"; the majority opinion seems to leave this question unanswered and in effect treats it as immaterial save for the fact that the majority ruling states: "It is enough for this case * * * that payment of money for imposed, unwanted and superfluous services such as the evidence shows Kemble attempted to enforce here by violent obstruction of commerce is within the language and intendment of the statute."

Second, was Kemble's sole purpose to obtain employment for a union helper? Judge McLAUGHLIN would answer "Yes". Judge STALEY would say in effect that this is a question for the jury; that if the answer be in the affirmative Kemble's actions are not within the prohibition of the statute; otherwise, the jury properly would have found him guilty, had the charge been adequate. The majority would say that a "Yes" or "No" answer is irrelevant despite the proviso quoted in the immediately preceding paragraph of this opinion.

Third, was there evidence to sustain a conclusion by the jury that Kemble was attempting to gain money or property other than by securing a helper's job for a member of his union?[17] Judge McLAUGH-

---

17. It is unnecessary to here state the final element, viz., the obstruction of commerce within the purview of the Act since there is no issue as to the existence of the necessary facts to sustain the conclusion that commerce was obstructed.

LIN'S answer would be "No"; Judge STALEY would say that this is a jury question. The majority opinion would, I think, hold this issue to be immaterial except in respect to the proviso quoted in the second paragraph, supra.

Fourth, is there evidence to sustain a conclusion that Kemble attempted to obtain money from the truck driver with his consent by the wrongful use of actual or threatened force? See Section 1(c) of the Act of July 3, 1946, 60 Stat. 420, the definition of "extortion". The majority opinion would say that this was a question for the jury subject to the proviso referred to immediately above and that the jury had resolved it against Kemble. Judge STALEY would rule that this is a jury question, proper instructions being given to the jury, but that the court below should have charged as to the requisite "criminal intent" within the purview of Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, viz., a taking, fraudulently attempted or accomplished, as an element of an extortion. Compare our decision in United States v. Kemble, 3 Cir., 197 F.2d 316. Judge STALEY states that it is necessary to interpret the Anti-Racketeering Act as "* * * imposing on the prosecution the burden of proving a felonious, corrupt intent—an intent similar to that customarily required in all larceny-type offenses." Judge McLAUGHLIN would hold that Kemble's act would not be covered by the statute so long as he was engaged, as Judge McLAUGHLIN concludes he was, in activity on behalf of his union.

As answers to the first three questions I state the following. It is unnecessary to determine whether this was or was not a labor dispute or whether Kemble's sole purpose was to obtain employment as a union helper for himself or for some one else, or whether he was simply attempting to gain money or property. The statute embraces all of this without differentiation. As to the fourth and last question: Is there evidence to sustain a conclusion that Kemble attempted to obtain money from the truck driver with his consent by the wrongful use of actual or threatened force? My answer is in the affirmative.

The fourth and last question embraces the major issue presented by the instant appeal and since there is sufficient evidence to sustain the conclusion that Kemble attempted to obtain money from the truck driver with his consent by the wrongful use of actual or threatened force, thereby obstructing commerce, I would vote to affirm Kemble's conviction had the charge been adequate.

The court below in its charge to the jury did not deal expressly with many of these questions though it seemed to be of the view that if Kemble attempted to gain money either for himself or for his union as payment for an unloading helper from the truck driver by wrongful use of actual or threatened force the jury was entitled to find Kemble guilty of the crime charged. The charge was correct as far as it went.[18]

From an examination of the legislative history of the 1946 Act, in force when the defendants' offenses were committed on May 13, 1947, and of the debates in the House of Representatives, in particular those set out in 91 Cong.Rec. 11,900–11,902, the conclusion is irresistible that Congress intended to obviate the decision of the Supreme Court of the United States in United States v. Local 807, 315 U.S. 521, 62 S.Ct.

18. An examination of the "Anti-Racketeering" Act, Act of July 3, 1946, in effect on May 13, 1947, 60 Stat. 420–421, when the offenses complained of were committed shows that it is a substitute for the original Act of June 18, 1934, 48 Stat. 979–980. The indictment charging Kemble and Local 676, returned February 15, 1950, is loosely drawn, and on its face seems to charge a conspiracy against Kemble and Local 676 but may be construed as charging Kemble and Local 676 with participation, individually, in a plan to obstruct interstate commerce by physical violence and threats of physical violence. Insofar as the record before us shows, no motion was filed to make the indictment more definite or certain or to draw it out. By the end of the trial of the case the court below and counsel for the parties were treating the indictment as charging participation in the acts prohibited by the statute rather than as an indictment for a conspiracy. I adopt their interpretation of the indictment.

642, 86 L.Ed. 1004, based on the 1934 Act, and to recast the Anti-Racketeering Act to obliterate the exception embodied in Section 2(a), in the phrase "* * * not including, however, the payment of wages by a bona-fide employer to a bona-fide employee * * *", and in Section 3(b), by the sentence, "The terms 'property', 'money', or 'valuable considerations' used herein shall not be deemed to include wages paid by a bona-fide employer to a bona-fide employee." See 48 Stat. 980. In the 1946 Act Congress defined the term "extortion" as the obtaining of property from an individual with his consent induced by the "wrongful" use of actual or threatened force. The 1946 Act was intended by Congress to apply to every individual whether he was acting on behalf of a labor union or not if commerce was obstructed by his use of violence or threats of violence. I therefore cannot accept Judge McLAUGHLIN'S interpretation of the statute, and the proviso quoted from the majority opinion in the second paragraph of this opinion seems to me to put a gloss or limitation on the statute which was not intended by Congress. But assuming that that majority opinion's proviso is proper the court's charge was devoid of reference to such a condition and therefore consistency would require the majority to hold the charge to have been inadequate.[19]

The word *wrongful,* used in Section 1(c) of the Act, the definition of "extortion", is not a term of strong art in the criminal law. *Wrong* is described as "An injury; a tort; a violation of right." 2 Bouvier's Law Dictionary, Rawle's Third Revision, page 3500. The same authority goes on to say that a "wrong" "[I]n its broad sense, includes every injury to another independent of the motive causing the injury. In its most usual sense wrong signifies an injury committed to the person or property of another, or to his relative rights unconnected with contract; and these wrongs are committed with or without force * * * A *public* wrong is an act which is injurious to the public generally, commonly known by the name of crime, misdemeanor or offense * * * *Private* wrongs * * * are injuries to individuals, unaffecting the public; these are redressed by actions for damages * * *" Webster's International Dictionary, 2nd ed., defines the word "wrong" as follows: "*Law.* A violation of the legal rights of another; an invasion of right to the damage of the party who suffers it; esp., a tort. Legally, *private wrongs* are civil injuries, immediately affecting individuals; *public wrongs* are crimes and misdemeanors which affect the community." It would seem to be the case therefore that in employing the word *wrongful* in the amended Anti-Racketeering Act Congress made use of a very broad term. Cf. the use of the word "unlawful" employed in the definition of "Robbery" in Section 1(b).

But did Congress mean to include within the Act both private and public wrongs, simple torts as well as crimes? If an individual in seeking employment threatened force, thereby obstructing commerce, but neither committed nor attempted robbery or extortion as those crimes are generally defined in the criminal law, including the law of New York, would his conduct fall within the proscription of the Act? Looking only to the face of the statute my answer would have to be "Yes", but I cannot bring myself to believe that such was the Congressional intent. Congressman Hancock when he described the purpose of the bill which became the Act of 1946, stated as follows: "This bill is designed simply to prevent both union members and non-union members from making use of robbery and extortion under the guise of obtaining wages in the obstruction of interstate commerce." Numerous congressmen made similar comments. Representative Hobbs, the father of the statute, made it very plain that the terms "robbery" and "extortion" as defined in the Act were intended to proscribe public wrongs, crimes, not private wrongs, mere torts, and that the law of New York

19. Though this point respecting the charge was not specifically asserted by Kemble, the first ground of the motion for judgment of acquittal or in the alternative for a new trial is broad enough to raise this issue.

furnished the basis of the proscription. Representative Hobbs said, "They [the terms robbery and extortion] have been construed by the courts not once but a thousand times. The definitions in this bill are copied from the New York Code substantially." See also the statement of Representative Robsion, and specifically the remarks of Representative Hancock, as follows, "The bill contains definitions of robbery and extortion which follow the definitions contained in the laws of the State of New York * * *" See 91 Cong.Rec. 11,900–11,906.

The court below, attempting to simplify a complicated legal and factual situation, charged the jury in the terms of the statute. It made no attempt to define the meaning of the term "wrongful" as used in Section 1(c). There was no instruction that the acts which Kemble had committed had to be found by the jury to constitute the crime of attempted extortion, a crime, as distinguished from a tort, a mere private wrong. The court did not instruct the jury as to the *mens rea* necessary to sustain the offense designated in the indictment. Indeed, the court made no mention whatsoever of the *mens rea* or the criminal intent which Kemble had to have had if he was to be found guilty. For these reasons I cannot vote to sustain Kemble's conviction. I agree with Judge STALEY that Kemble's sixth requested charge was sufficient to raise the issues here discussed. Though the request was not entirely apt or artistic nonetheless the necessary substance was presented. I conclude therefore with Judge STALEY that a new trial should be had as to Kemble.

I agree with the conclusion expressed by the majority, however, that there is insufficient evidence to bring the Local within the provisions of Section 6 of the Norris-LaGuardia Act, 47 Stat. 71, in the light of the decision of the Supreme Court in Brotherhood of Carpenters and Joiners of America v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973. Therefore, I concur in the view that the judgment as to No. 10,423 should be reversed and a judgment of acquittal entered as to the Local.