Carl BIANCHI, Appellant,

v.

UNITED STATES of America, Appellee.

L. A. THOMPSON, Appellant,

v.

UNITED STATES of America, Appellee.

William POSTER, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 15045–15047.

United States Court of Appeals, Eighth Circuit.

Feb. 10, 1955.

Morris A. Shenker and Sidney M. Glazer, St. Louis, Mo. (Morris A. Shenker and Mark M. Hennelly, St. Louis, Mo., for appellant Bianchi, Harry H. Craig, St. Louis, Mo., for appellant Thompson, and Philip A. Foley and William Hough, Clayton, Mo., for appellant Poster, were on the brief), for appellants.

Forrest Boecker, Sp. Asst. to the U. S. Atty., St. Louis, Mo. (Harry Rich-

ards, U. S. Atty., St. Louis, Mo., and Tom DeWolfe, Sp. Asst. to the Atty. Gen., were with him on the brief), for appellee.

Before SANBORN, WOODROUGH, and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

These are appeals by defendants, Bianchi, Thompson, and Poster, from conviction on two counts of an indictment and judgments and sentences imposed thereon. The appellants will be referred to herein as defendants, and unless otherwise indicated the defendants shall include the three defendants above named. The charges were based on section 1951, Title 18, United States Code, which is known as the Hobbs Act and the Anti-Racketeering Act. This statute, so far as material, provides:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—
\* \* \* \* \*

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. ·

"(3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State.

through any place outside such State; and all other commerce over which the United States has jurisdiction."

Count I of the indictment charges defendants with conspiring to obstruct interstate commerce by extortion, and Count II charges the substantive offense of obstructing commerce by extortion. The extortion charged was that the defendants obtained $15,312 for their personal use and profit from the Trojan Construction Company engaged in a project in interstate commerce "by threatening physical violence to the person of the said Felix Johnson and upon the properties of the said 'corporation' and by using their aforesaid respective union capacities in a wrongful, arbitrary, unreasonable and oppressive manner to create industrial strife and unrest on the aforesaid pipe line projects by refusing to permit the union workmen engaged and to be engaged on said pipe line projects and who were under the respective union jurisdiction of the said defendants to begin and continue their work duties, among other things, unless and until the said 'corporation' should pay the defendants the aforesaid money."

The record is voluminous. Some facts are disputed. In determining the sufficiency of the evidence, this court must, upon defendants' appeals, view the evidence in the light most favorable to the Government, and give the Government the benefit of all inferences which can reasonably be drawn from the evidence. If there is evidence to support the verdict, we are not concerned with the credibility of the witnesses. Hulahan v. United States, 8 Cir., 214 F.2d 441. The facts will be briefly summarized, giving the Government the benefit of the foregoing rule.

The indictment charges and the evidence establishes that Bianchi was labor representative of the Operating Engineers, Poster was labor representative of the Laborers, and Thompson was labor representative of the Teamsters, for the St. Louis area. All defendants met representatives of the Trojan Company

at a St. Louis hotel on August 1, 1950, and complained about said company moving into their territory without consulting them as business agents for their respective unions. The representatives of the company explained that it had a national agreement with the unions, and that its employees had union certification, and that under the national agreement it was permitted to come into the area. Defendants stated that national agreements meant nothing to them, and insisted that local labor be used, Thompson further stating that his union was not a party to the national agreement. Defendants had another meeting with the company officials on August 8, at which time the work on the company's project had been stopped. No progress was being made in the negotiations. Bianchi and Thompson went into the bedroom, and shortly thereafter called in Johnson, Trojan's representative, for a private conference, and stated to him that they were not getting anywhere in settling the labor dispute, and that they would fix it up so that the work could be resumed and the job could be completed for the payment to them of three cents a foot for the pipe that Trojan was removing. Johnson asked time to take this proposition up with his company. The following day Thompson and Bianchi had further talks with Johnson who advised them that the company didn't like the arrangement, but would make the payments demanded. Discussion followed as to the method of payment, and it was agreed that the payments would be made in the form of rental for fictitious equipment which would be neither furnished nor used. Some time later Bianchi and Poster called on Johnson to inquire about the progress being made in paying the equipment rentals. The equipment rentals were paid as directed by the defendants. The defendants organized a company known as the Washington Equipment and Construction Company of which Poster was president, and Thompson, vice-president. The jury were warranted in finding that the de-

fendants individually derived the benefit of the fictitious rentals. The testimony of the Trojan Company officers would support a conclusion that the payoff was made because of fear of economic loss, of injury to employees, and of damage to equipment. As to the defendants' testimony, it is summarized by the trial court in its ruling on defendants' motions for acquittal and for a new trial, as follows:

"Neither defendant took the stand in his own defense. Most of the one statement made and the prime effort of the defense presentation was devoted to showing labor relations between certain unions and the Trojan Company. Defendants patently sought to convert the trial into a labor dispute hearing. Because of this failure or refusal of defendants to meet the real issue, we find the matters presented on motion for new trial not plain in their relation to the issues submitted to the jury."

The evidence will be further developed hereinafter.

The defendants' brief sets out in 14 divisions the reasons why they feel this case should be reversed. We have rearranged and consolidated these divisions to some extent. The errors urged, which we will consider in the order listed, are as follows:

1. Overruling of motion for acquittal.

2. Overruling of motions for transfer and continuance.

3. Admission of evidence of fears of officers paying money.

4. Refusal to give requested instructions.

5. Refusal to submit violation of Taft-Hartley Act as included offense.

6. Error in instructions given.

7. Overruling of motions for mistrial and acquittal because of variance between indictment and proof.

8. Errors in limiting defendants' cross-examination and excluding testimony.

9. Invalidity of Anti-Racketeering statute for the reason that the extortion definition is too indefinite.

1. Defendants contend that the threats, if any, do not go beyond putting their victim in fear of financial loss, and that such type of fear is not within the scope of the Anti-Racketeering Act. They insist that for said Act to be applicable fear of physical violence or property damage must be present. The statute here involved is a revision of sections 420a–420e, Title 18, United States Code, 1940 Edition, which was in effect when some of the cases hereinafter referred to were decided. Subdivision (b) of section 420a is as follows:

"Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right * * *." 48 Stat. 979, 980.

Thus, the offense now labeled "extortion" was provided for in substantially the same terms in both the present Act and the one it replaced. The former law contained a provision that it did not apply to cases of payment of wages by a bona fide employer to a bona fide employee. The Supreme Court in United States v. Local 807, etc., 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004, held that the employment exception was applicable to members of a New York truck drivers union, whose bona fide offer of their services to outside truck owners entering the State was rejected and who attempted unsuccessfully by violent means to achieve the status of employees. Congress was dissatisfied with the result of this decision. Hearings were held, later resulting in the enactment found in 60 Stat. 420, which is substantially the same as the present law, 18 U.S.C. § 1951. The legislative changes are reviewed in United States v. Kemble, 3 Cir., 198 F.2d 889, 891. The court said:

"Beyond formal reorganization and improvements in language the principal change accomplished by the new bill was the elimination of the exception the effect of which

had been stated in the Local 807 case. More particularly, the 1946 reenactment covered interference with interstate commerce by actual or attempted 'extortion' and defined 'extortion' as 'the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force * * *.' "

In Nick v. United States, 8 Cir., 122 F.2d 660, 138 A.L.R. 791, Nick, who controlled the motion pictures operators union, made excessive demands for wage increases for his union members. No progress could be made in negotiations for settlement of the dispute until Nick's demand for payment of $6,500 was met, after which a reasonable settlement of the labor dispute was quickly worked out. The only threat Nick made was to have his operators strike and the only fear involved was the fear of economic loss which would be occasioned by such a strike. There is nothing in the opinion to indicate that there was any evidence of threats of physical violence to person or property. The conviction was upheld, the court saying, 122 F.2d at page 671:

"The gist of the unlawful act is extortion. Extortion involves a state of mind as an element of an offense under the Act. Unless there is some form of compulsion (either physical or fear) there is no crime under this Act."

In United States v. Compagna, 2 Cir., 146 F.2d 524, which involved a conspiracy to extort money from motion picture producers and exhibitors through threatened strikes unless a pay-off was made, the court expressly states that the victims were not threatened with violence. Nevertheless, the conviction was affirmed. In Hulahan v. United States, supra, the factual situation is very similar to the situation here. The victims testified that they were told that if money was paid to defendant their jobs would run smoothly; otherwise, not. The victims' attorney went one step further and stated that in addition to the above the defendant stated that if the money was

not paid work that was done might have to be done over because of damages that might occur to the work. This court, after reviewing the evidence, found that defendant's motion for acquittal was properly overruled, stating, 214 F.2d at page 444:

"There is no doubt that, under the evidence of the Government, Hulahan was guilty of conspiracy to extort, of attempts to extort, and of actually in two instances extorting, money from the construction companies named in the indictment, by means of express or implied threats of labor trouble. We think that Hulahan was shown to have been doing the very things that Congress, in enacting § 1951, Title 18, U.S.C., sought to reach and to make federal offenses, provided interstate commerce was affected."

■ Fear is not defined or qualified in the extortion definition. In the robbery definition in another section of the Anti-Racketeering Act, "fear" is limited to fear of injury to person or property. Defendants contend that "fear" in the extortion definition should be similarly limited and restricted. Robbery and extortion are distinct offenses. If Congress had intended "fear" in the extortion statute to have a restricted meaning, it could have easily made this clear by so limiting it in the extortion definition or by so defining "fear" whenever the word was used in the statute. As to this contention of the defendants, the trial court said:

"Defendants argue that extortion by 'fear' is not covered by the Act and that the Act limits extortion to money received only as a result of 'force or violence or a threat thereof.' The meaning of the Act on this point is as plain as the English language could make it. This is not the place to amend or rewrite the Act."

We see no reason why "fear" as used in the extortion statute should not be given its ordinary meaning. It is a simple and well understood word. The present Anti-Racketeering Act and its predecessors have been in force since 1934. As above pointed out, there appears to have been no substantial change made in the definition of extortion. The Nick and Compagna cases, previously discussed, involved only threats which created fear of economic loss, and are authority against the defendants' contention. Defendants have cited no authority sustaining their position. We conclude that "fear" as defined in the extortion section of the Anti-Racketeering Act should be given its ordinary meaning, and consequently "fear" would include fear of economic loss.

■ The threat of a prolonged illegal strike would create more fear because of potential economic loss to the victim than the threat of destruction of a few boards or tools. We feel that if fear of damage to property is necessary the victim's rights under its construction contract may well be considered property. The definition of property in the Act is not restricted to any particular type of property. In Webster's New International Dictionary, 2d Edition, "property" has been defined as follows:

"The exclusive right to possess, enjoy, and dispose of, a thing; ownership; in a broad sense, any valuable right or interest considered primarily as a source or element of wealth * * *.

"That to which a person has a legal title; thing owned; an estate, whether in lands, goods, money, or intangible rights, such as copyright, patent rights, etc.; anything or those things collectively, in or to which a man has a right protected by law * * *."

See also 73 C.J.S., Property, § 1, page 142. Even if the definition of fear were to be restricted as contended by defendants, there is evidence that such fear existed. It is true the record contains no direct or positive threat of physical violence or property damage. However, the victim's officers testified that by reason of defendants' conduct they were placed in fear of economic

loss. of injury to employees, and of damage to equipment. Under the record such a fear would not be an unreasonable one. The record on continuance and transfer shows wide publicity of terroristic tactics in similar matters. In denying bail the trial court said:

"Defendants have had numerous arrests, some in connection with labor activities. One defendant was convicted in 1931 for 'Breaking and Entering.' The Federal Bureau of Investigation record shows some thirty arrests, many of them for investigation, peace disturbances, interference with lawful employment. We refer to defendant Bianchi. Defendant Thompson was arrested in 1926 on suspicion of robbery; in 1929 convicted for assault to rob, for which he received a three year sentence in the penitentiary. Defendant Poster has been arrested numerous times for affrays and assaults; once for carrying concealed weapons and transporting explosives; once for flourishing a deadly weapon; and once for suspicion of bombing; once for intimidation; a conviction in 1936 for conspiracy and a fine of $500.00; a conviction in 1928 of violation of the liquor laws and a fine of $300.00. * * * "

This evidence was, of course, not before the jury for consideration. However, the following language from the Compagna case, supra, 146 F.2d at page 529, has a bearing on the reasonableness of the fears expressed:

"The victims' fears originated from acquaintance with the general disorders and violence which had accompanied other strikes. As such, it was part of what everybody knows, and I cannot see how it could have prejudiced the accused with the jury. Indeed it was entirely proper for the jury to infer that the accused expected to play upon precisely such fears, when Bioff threatened to call strikes."

The Anti-Racketeering Act does not curtail legitimate labor activities. Labor has an undoubted right to strike for better wages and working conditions. However, the union members can derive no benefit from their representatives accepting individual payments. This situation is well described in the Nick case, supra, 122 F.2d at page 668:

" * * * The Act covers no action by a labor leader honestly acting for the members of his organization. It does cover the compulsory payment of graft to a labor leader for his own individual enrichment. Thus construed, the Act is clearly as protective to labor organizations and their membership as it is to employers. The payment of graft to a labor leader is, clearly, the purchase of his loyalty to his organization. The result is betrayal of his organization. Labor is likely to suffer more through such a sellout than the employer who, willingly or unwillingly, pays the bribe. By punishing the traitorous leader who uses his power for his personal enrichment at the expense of his organization, the Act truly is at least as protective of employees as it is of employers. The Act makes such betrayal hazardous."

It is further contended that the Taft-Hartley Act has modified the Anti-Racketeering Act so as to make the latter Act inapplicable to employee representatives. No authorities are cited to support this contention. The contention is untenable. The offense involved in the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., is a voluntary offering of a present or a gift to employee representatives. Under the Anti-Racketeering Act money or property is demanded under threat of force or fear. The statutes do not cover the same ground.

Defendants also contend that commerce was not obstructed. Briefly, the project here involved the removal of an abandoned pipeline and its shipment out of the State and the installation of

loops to an existing interstate pipeline. The material, equipment, and employees moved in interstate commerce. There was ample evidence to support the finding that obstruction of commerce was involved. Hulahan v. United States, supra. It is also noted that no exceptions were taken to the instructions submitted to the jury on the commerce phase of the case.

■ As to the matter of evidence connecting defendants with the crimes charged, the evidence discloses that all defendants participated in the initial conferences. While Poster was not present at the pay-off conferences which were handled by Bianchi and Thompson, he was with Bianchi at the time of the check-up on the payments. He was president of the company receiving the pay-off, and actively participated in the fictitious equipment rentals. He had joined in the negotiations preliminary to the pay-off demand. After the pay-offs, none of the defendants made any further demands of the Trojan Construction Company on behalf of their unions for improvement of labor conditions or wages. There was sufficient evidence to warrant the jury in finding that all defendants knowingly and intentionally participated in the extortion plan. Defendants' motion for acquittal was properly overruled.

■ 2. Defendants each filed three separate motions for transfer to another district and each filed three motions for continuance, all of which were overruled. Prejudice against defendants is claimed because of a report of the Grand Jury and the District Attorney's Office on the racketeering investigation, released at the time the indictments were returned on July 23, 1953, and also on the charges of Judge Moore to the Grand Jury in April and November, 1953, and many newspaper and radio comments mostly against racketeering in the area in general. The issue of the propriety of these various items is not directly before us. We are concerned with their effect on potential jurors. Rule 21(a) of the Federal Rules of Criminal Procedure, 18 U.S.C., provides for a transfer to another district or division when the court is satisfied that there exists so great a prejudice against the defendant that he can not have a fair and impartial trial in the district where the offense is alleged to have been committed. In Finnegan v. United States, 8 Cir., 204 F.2d 105, this court considered defendant's claim that the failure to sustain his motion for a continuance because of prejudice against him was error. Wide publicity had been given to the charge against Finnegan by newspaper articles, national magazine articles, and proceedings of a congressional committee and the grand jury. In sustaining the denial of a continuance, this court said, at page 110:

"* * * The mere showing that great publicity had been given the matter of the charges against defendant was certainly not sufficient to warrant this court in reversing the case on the ground of the denial of defendant's motion for continuance. * * * Finally, it may be said that newspaper publicity tending to excite public prejudice against a defendant is not usually considered as a sufficient reason for granting an application for continuance. * * *"

The trial judge was familiar with the local situation. He carefully examined the jurors and asked the jurors all questions defendants' counsel submitted. The examination of the jurors did not disclose any prejudice against the defendants. In addition the jury were very carefully instructed by the court to lay aside all extraneous matters and to determine the case solely on the basis of the evidence introduced in the court room. In matters such as this the trial court is wisely vested with a large discretion. Considerable time elapsed between the time of the indictment on July 13, 1953, and the time of trial on February 15, 1954. Under the record here made we can not say that the trial

court abused its discretion in overruling the motions for transfer and continuance.

 3. Admission of evidence of the fears of officers of the corporation making payment is objected to. Such testimony was admitted solely for the purpose of showing the state of mind on the part of the representatives of the company making payment. As to this evidence the court in its instructions to the jury said:

"I say to you that this testimony was admitted solely for the purpose of showing the state of mind of the party or parties speaking, with reference to why money would be paid, if you find any was paid, as charged in the indictment, and if you find this testimony did show a state of mind, then you can consider it for that purpose only, and for no other purpose in this case. You are not bound by these statements of Felix Johnson in determining his state of mind, but you may consider all the facts and circumstances in determining the state of mind of Felix Johnson at the time he allegedly agreed to pay money as directed, according to the Government's testimony, by defendants Bianchi and Thompson."

This evidence was admissible for the purpose for which it was received. Nick v. United States, supra; United States v. Compagna, supra. In any event, as stated in the Compagna case, if there was error in admitting this testimony, it was without prejudice as it was entirely proper for the jury to infer that the accused expected to play upon such fears.

 4. Defendants insist that the court erred in refusing to give requested instruction No. 14 which is based on section 106, Title 29, United States Code. United States v. Kemble, supra, is authority for defendants' contention that section 6 of said Act applies to the Anti-Racketeering Act. In the Kemble case and in United Brotherhood of Carpen-

ters and Joiners v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973, the union was indicted solely on the basis of acts of its agents and representatives. In the last cited case the Supreme Court said, 330 U.S. at page 403, 67 S.Ct. at page 780:

"* * * We hold that its purpose and effect was to relieve organizations, whether of labor or capital, and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization without clear proof that the organization or member, charged with responsibility for the offense, actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."

If, in the case we are now considering, the unions or the officers thereof, represented by the defendants, were indicted, defendants' cited cases would be direct authority demanding acquittal. Here, however, each defendant belonged to a separate union. No defendant is charged with responsibility for the act of any officer, member, or agent of his union. There was no error in refusing instruction No. 14.

 Defendants also complain of refusal to give requested instructions 24, 27–31, 46–52, and 62, concerning differences between the Anti-Racketeering Act and the Taft-Hartley Act and advising the jury not to convict if only the Taft-Hartley Act was violated. The defendants were not on trial for violation of the Taft-Hartley Act. The court gave defendants' requested instruction No. 20 which states in part:

"The mere receipt of money or any other thing of value by a labor representative of employees from the employer of such employees is not of itself sufficient to constitute an offense under this indictment * * *."

Under this instruction the jury were clearly told that defendants could not be

convicted for the improper receipt of money alone. This is all that the defendants were entitled to. There was no necessity under the record in this case to instruct in detail as to an offense for which the defendants were not on trial. The court properly refused these instructions.

5. Defendants contend that the violation of section 302 of the Taft-Hartley Act, 29 U.S.C.A. § 186, should have been submitted as a lesser or included offense. We have heretofore answered this contention in part. The Taft-Hartley Act provision makes it unlawful for an employer to give to his employees' representative any money or thing of value, and likewise makes it unlawful for such representative to receive from the employer any money or thing of value. The following language is included in the requested instructions:

"The difference between this lesser crime and the crimes charged under each count of the indictment is the lack of force, violence and fear and the lack of intent on the part of the defendants to employ force, violence and fear to obtain money or any other thing of value from Felix Johnson."

The Taft-Hartley offense is in the nature of bribery. The offense for which the defendants were tried is extortion. There are substantial differences between these offenses. Some of the differences are pointed out in the foregoing excerpt from the requested instructions. Rule 31(c) of the Federal Rules of Criminal Procedure provides:

"Conviction of Less Offense. The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense."

In Giles v. United States, 9 Cir., 144 F.2d 860, at page 861, the court said:

" 'To be necessarily included in the greater offense the lesser must be such that it is impossible to commit the greater without first having committed the lesser.' "

Manifestly, the crime of extortion can be committed without committing bribery. The trial court was of the opinion that the record would not support a conviction of bribery. The case was not prosecuted on that theory, and the record does not support such a charge. There was no reversible error in refusing to submit the violation of the Taft-Hartley Act as an included offense.

6. Defendants urge error in some of the instructions given. They contend that it was error to include in the charge the hypothesis that there was a cessation of work brought about by the defendants for the reason that there was no evidence to support it. We believe there was evidence from which the jury could infer that defendants had a part in the work stoppage. At their request defendants entered into labor negotiations with Trojan officials. Defendants advised such officials that upon pay-off work could proceed without difficulty. After the pay-off it did so proceed. There is also Aikin's evidence that defendants told him they were going to shut him down and he had better see Johnson.

Defendants complain that under the instructions given the jury could find defendants guilty if they obtained money under color of office as union representatives. Defendants are referring to the common law offense of extortion where, in case of public officers, color of office takes the place of force, threats, and pressure. No one contends that defendants are liable merely because they are union officials, and obtained the money. As to this contention the trial court in ruling on motion for a new trial said:

"The only time such terms have come into this case they were injected by the defendants. They appear once in the charge and then at defendants' request and in a nega-

tive way. Defendants requested and the Court gave their request number 54. It reads:

" 'If a Union officer accepts money or property as a private individual and not in his official capacity there can be no finding of extortion under color of office however inconsistent with official duty may be the acceptance of such money or property.' "

The defendants are not in a position to object to an instruction given at their request.

■ Defendants likewise claim error in the portion of the instruction advising the jury, "A person is presumed to intend the natural and reasonable consequence of his own act." The foregoing excerpt is but a small portion of a lengthy instruction on intent. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, cited by defendants, holds that criminal intent is an essential element of the crime of larceny there charged, and that the issue of intent should have been submitted to the jury and not peremptorily decided by the court. In the case which we are now considering, intent was dealt with at length in the instructions, and the court advised the jury that they must find criminal intent in order to convict. A portion of the instruction on intent reads as follows:

" * * * What I now desire to call your attention to is that it is necessary, before you find the defendants, or either of them, guilty, as charged under count 1, that you find the defendants became parties to the conspiracy charged intentionally and with the knowledge of the purposes of such conspiracy and for the purpose of furthering its aims and objects. When I say intentionally and knowingly, I mean that they became such parties with bad purposes, without justifiable excuse. I say to you that the defendants must be shown to have had grounds for believing and did believe the purposes of the conspiracy were unlawful and that the purposes of the conspiracy would affect interstate commerce, as charged in the first count of indictment. * * * "

We have approved language similar to that here objected to. Bentall v. United States, 8 Cir., 262 F. 744; Blumenthal v. United States, 8 Cir., 88 F.2d 522.

■ The point is likewise made that the court erred in not withdrawing the issue of physical violence to person or property from the jury. It is true, as contended by defendants, that there is no proof of use of violence to person or property or any positive proof of actual threats of such violence. A careful reading of the instructions discloses that the case was not submitted to the jury on charges of actual or threatened force or violence, but was submitted on the fear portion of the extortion statute. The following excerpt illustrates the type of extortion submitted:

"But it is claimed by the Government that the motive behind the conditions laid down by the defendants for agreeing for the men to resume work was to extort from the Trojan Construction Company, under the compulsion of threats of labor trouble on their jobs and stoppage of work, the payments of moneys to the defendants personally, and that this money was paid by the Trojan Construction Company under fear that the work would not otherwise proceed; in other words, extortion."

The instructions given are lengthy. Defendants requested at least 63 instructions. Neither the instructions nor the requests can be set out at length without unduly extending this opinion. All exceptions to the instructions have been considered, as well as the instructions as a whole. We find no merit in the objections urged by the defendants to the court's instructions.

■ 7. Defendants contend that the court erred in overruling their motions for a mistrial and acquittal because of substantial and prejudicial variance be-

tween the indictment and proof. It is conceded that there is no proof to support the charges of the indictment that there were threats of physical violence to person and property. However, in addition, the indictment fairly charges extortion contrary to section 1951, Title 18, United States Code. This statute by its extortion definition makes it unlawful to obtain money or property by the wrongful use of fear. The basis upon which the Government claims the fear is created is defendants' wrongful use of industrial strife and its threatened continuation unless pay-off is made. In Crain v. United States, 162 U.S. 625, 636, 16 S.Ct. 952, 955, 40 L.Ed. 1097, the Court said:

"* * * We perceive no sound reason why the doing of the prohibited thing in each and all of the prohibited modes may not be charged in one count, so that there may be a verdict of guilty upon proof that the accused had done any one of the things constituting a substantive crime under the statute. * * *"

To the same effect, see also Price v. United States, 5 Cir., 150 F.2d 283, 285; Ackley v. United States, 8 Cir., 200 F. 217, 221; Mellor v. United States, 8 Cir., 160 F.2d 757, 761. Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314, cited by the defendants, affords them no relief. The test there prescribed is:

"The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense."

The indictment in this case sufficiently advised the defendants of the charge upon which they have been convicted.

■ 8. Defendants urge error in limiting their cross examination of certain witnesses and in sustaining the Government's objections to certain testimony. The errors urged are very general, and are not supported by convincing applicable authority. Many of the objections may be disposed of by applying the general rule to the effect that the extent of the cross examination rests largely in the sound discretion of the trial court. Holmes v. United States, 8 Cir., 134 F.2d 125; Myres v. United States, 8 Cir., 174 F.2d 329.

■ In some instances the testimony was properly excluded because it was beyond the scope of the direct examination, and there are other valid reasons stated in some of the objections which warranted the ruling made. Defendants have not set out in their brief their numerous objections in detail. Error is claimed in restricting the defendants' cross examination of Felix Johnson about whether or not he was paying the prevailing wage and whether the national contract provided there should be no work stoppages. The defendants were permitted to introduce the national agreement and to show the prevailing wage scale and the wages Trojan paid through their own witnesses. Error is further claimed in refusing to permit cross examination of Albert Johnson as to whether or not he liked to have his company unionized, and in refusing defendants the right to go into detail as to rentals received from Trojan by the witness Knapp. A further complaint is that the court refused to permit cross examination of Felix Johnson as to whether he was invited at a contractors' meeting to make complaints about any conduct of labor representatives, and to admit testimony of defendants' witnesses on this subject. The international agreement is in evidence, and said agreement provides that there shall be no strikes, and that violation should be reported to the international union.

■ The Government's witness Aikin, on cross examination, denied that he had offered a bribe to one Cline, a witness for defendants. The court sustained the Government's objection to defend-

196

ants' offer to prove by Cline that Aikin had offered him a bribe. Defendants claim this evidence to be admissible to show interest, bias and prejudice on the part of the witness and to show that Aikin violated the Taft-Hartley Act. Cline was not a defendant and Aikin was not a victim of defendants' acts here involved. This evidence was properly excluded on the basis that a witness can not be impeached on a collateral matter by extrinsic evidence. See Cwach v. United States, 8 Cir., 212 F.2d 520, 530. The court did not commit any prejudicial error in its rulings restricting cross examination by defendants and in excluding the evidence hereinabove referred to.

■■■ 9. Finally, defendants urge error in the overruling of defendants' motion to dismiss based on the invalidity of the statute, in that the word "wrongful" in the extortion definition is too vague and too indefinite to provide an actionable standard of guilt and therefore violates the due process clause of the Fifth Amendment. "Wrongful" is defined in the original Anti-Racketeering statute as the violation of the criminal laws of the United States or of any State or Territory. Judge Biggs, in his dissenting opinion in United States v. Kemble, supra, 198 F.2d at page 902, states that "wrongful" is not a term of strong art in the criminal law. He quotes various definitions and recites the legislative history of the Act, and reaches the conclusion that Congress by the use of the word "wrongful" intended a public wrong or crime as distinguished from a private wrong. The majority opinion in the case held that the Act was intended to cover forced payment of wages in a proper case, and that the case there being considered was a proper case.

We do not believe that Congress by omitting the definition of "wrongful" in the present Act intended to change the meaning of the word as defined in previous acts. So construed, the definition of extortion in the present statute is substantially the same as it was in the former statute. The constitutionality of the earlier statute was fully considered and upheld by this court in Nick v. United States, supra. See also United States v. Compagna, supra. The statute upon which the indictment is based does not violate the due process clause contained in the Fifth Amendment to the Constitution.

A careful consideration of all of the errors urged by defendants leads us to the conclusion that no reversible error has been shown. The defendants have had a fair trial. The judgments and sentences are affirmed.