UNITED STATES of America, Appellee,

v.

Donald P. MATLOCK, Appellant.

No. 81–2152.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 12, 1982.

Decided April 14, 1982.

Mittendorf & Mittendorf, Union, Mo., for appellant.

Thomas E. Dittmeier, U. S. Atty., Robert T. Haar, Asst. U. S. Atty., St. Louis Mo., for appellee.

Before LAY, Chief Judge, STEPHENSON, Circuit Judge, and GIBSON,* District Judge.

STEPHENSON, Senior Circuit Judge.

Donald Matlock appeals his jury conviction of possessing and transferring a destructive device.[1] He was convicted of supplying dynamite to four individuals who robbed a jewelry store in Rolla, Missouri. Matlock appeals on the grounds that the district court erred in not dismissing his indictment as too vague to allow him to adequately prepare his defense, in denying his motions for acquittal, new trial, and judgment N.O.V., and in refusing to admit the testimony of Martin Eimer on the grounds that it was impeachment on a collateral matter. We affirm the district court.

### FACTS

The government introduced both physical evidence and the testimony of thirteen witnesses in attempting to prove the chain of events establishing guilt. The government relied heavily on the testimony of David Childs, Gilbert Nash, and Jerry Nash whom Matlock allegedly supplied with the dynamite.[2]

In early 1981, David Childs, Kevin Cook, Gilbert Nash, and his brother, Jerry Nash, planned to rob a jewelry store in Rolla, Missouri. To carry out this plan, the group planned to detonate explosives at a power substation in downtown Rolla in order to knock out the power to the jewelry store. They also planned to set off a bomb at a drive-in bank as a diversion.

Donald Matlock, a contractor involved in the demolition, salvage, and construction of housing and a former employer of Childs, had earlier expressed a willingness to help the group obtain dynamite. However, they were unable to find Matlock until January 4, 1981. At approximately 1:00 p. m. on that day, Childs and the two Nash brothers were driving in a maroon van west on Highway 72 in Rolla. They passed Matlock who was driving a backhoe east on the highway. Childs and the two Nash brothers immediately turned their vehicle and caught up with Matlock.

Matlock pulled the backhoe onto a side street and talked with a man whom Childs thought was a Case equipment dealer. Childs approached Matlock and asked him for twelve sticks of dynamite. Matlock responded that he could help Childs but that Childs and the Nash brothers would have to go with him to his house. Childs and the Nashes had noticed that Matlock had been followed by a woman in a white and blue G.M.C. Blazer. This woman was identified as Matlock's girlfriend and fiance Nan Anselm.

After the conversation, Childs returned to the van. Childs and the Nash brothers followed Matlock, who was driving the backhoe, and Anselm, who was driving the Blazer, east on Highway 72 to Vernon Whites Television Store. The Whites were personal friends of Matlock and allowed him to keep equipment and salvage behind their shop. Matlock parked the backhoe behind the repair shop.

Childs and Matlock got into the Blazer with Anselm and proceeded to Matlock's house. The Nash brothers followed in the van.

---

* The Honorable John Gibson, United States District Judge for the Western District of Missouri, sitting by designation, now Circuit Judge.

1. The Honorable John K. Regan, United States District Judge for the Eastern District of Missouri, presiding. Two prior trials of Matlock on these charges resulted in mistrials because of the failure of the juries to reach a verdict.

2. Childs pleaded guilty to a charge of damaging the Phelps County drive-in facility by means of an explosive device and conspiracy to damage both that bank facility and the Show-Me Power Station in Rolla. A charge of bombing the power station was dropped.

Jerry Nash pleaded guilty to one count of bombing and charges of conspiracy to bomb and another count of bombing were dropped. Gilbert Nash also pleaded guilty to one count of bombing and the two other charges of bombing and conspiracy to bomb were dropped.

As the two vehicles traveled to Matlock's residence, they passed an older white van with a TV decal on it.[3] The van was apparently having engine difficulty. Matlock pulled the Blazer off the road in order to assist the driver of the other van. The Nashes also stopped their van.[4] After talking with the driver of the white van, Matlock drove the Blazer, with Anselm and Childs, to his house. The Nashes followed in their van.

Matlock's house was described as an old red brick structure covered with chipped white paint. Matlock took Childs in back of the house where he kept a pit bulldog.[5] After some conversation about the bulldog, Matlock and Childs, followed by the Nash brothers, proceeded to a shed. On the way, Matlock entered his house and returned with a .45 caliber pistol.[6] Childs and Matlock went into the shed and Matlock removed a cardboard box from an old refrigerator. The box contained five large sticks of dynamite, another large stick of dynamite broken into pieces, a smaller stick, blasting caps and several other items. By this time, the Nashes had also entered the shed, saw Matlock remove the cardboard box from the refrigerator and observed the contents of the box.

Matlock told Childs and the Nashes that they could have the box and its contents. Childs asked Matlock how to make a bomb and Matlock told Childs how to detonate the dynamite.

While Gilbert Nash placed the box and its contents in his van, Matlock, Childs and Jerry Nash walked to the front of the house. There, at Matlock's invitation, Childs fired the .45 caliber pistol at a tree. Matlock then brought out a single barrel shotgun and Childs fired it into a tree. Matlock and Childs discussed the pattern the shot made.[7] Matlock invited the three men into the house and gave them beer.[8]

Matlock asked Childs whether anyone would be hurt by the dynamite. Childs replied that no one would be hurt but that Matlock should not be surprised if his lights went out that night. Matlock inquired whether they were going to blow up the power station near the skating rink in Rolla. Childs responded that this power station was fairly close to houses and did not distribute the power they wished to disrupt.

Matlock told Childs he did not owe him anything for the dynamite in light of the favors they had exchanged in the past. Matlock asked whether Childs knew the whereabouts of Larry Weber whom Matlock believed had broken into his house.

Matlock also showed Childs and the Nashes a .25 caliber handgun which he said he had purchased for Anselm's protection after the break-in. A .25 caliber handgun was

---

3. Mary Jane Whites testified that they owned a white van with a Zenith Television emblem on it. However, she claimed it was not operated on January 4.

4. On January 4, Patricia Zaritz was visiting her mother who lived on Tenth Street next to Matlock's residence. Zaritz testified that on that day she saw, from her mother's house, three vehicles, one of which was a white van, and seven young men alongside Tenth Street. She knew Matlock and Childs and identified them as two of the men in the group.

5. Matlock admitted the existence of this dog at trial.

6. Matlock claims he never owned such a weapon and none was recovered in the search of his premises.

7. Matlock denied that he had possessed a shotgun or a .45 caliber pistol. However, Anselm told a Bureau of Alcohol, Tobacco and Fire-

arms agent there was usually a shotgun in the house.

A highway patrol officer later found a shotgun pattern in the tree described by Childs. The officer also found expended .45 caliber shells, a loaded .45 caliber bullet and expended shotgun shells. Two loaded shotgun shells were found in Matlock's Blazer and boxes of .45 and .25 caliber ammunition were found in the basement of the house.

8. The descriptions of the house later given by Childs and the Nashes were consistent with the descriptions given by law enforcement officers. Childs and the Nashes testified that Matlock showed them where a gun had discharged in the kitchen wall. This hole was later found by law enforcement officers. Matlock testified that neither the Nashes nor Childs had ever been in the house.

later found in the search of the Matlock residence and was admitted into evidence.[9]

Childs told Matlock that if the robbery was successful they would send him "something." Matlock replied that such action was not necessary.

Childs said he and the Nashes had to leave in order to pick up Cook. As they were leaving, Matlock said he hoped no one would be hurt. He then shook the pistol and warned, "if anybody finds out about this, there are people that I know that you can't hide from." Childs and the Nash brothers left the farm.

Childs and the Nashes picked up Cook and, between approximately 6:00 and 6:30 p. m., the four checked into the Manor Inn motel in Rolla. The Nash brothers left to have dinner with their grandmother and Cook and Childs assembled four bombs. When the Nash brothers returned later that evening, Gilbert Nash questioned whether a nine-volt battery would have sufficient power to detonate the charges. Childs, using the unlisted number which Matlock had given him earlier that evening, called Matlock. Matlock confirmed that the battery would be sufficient to detonate the dynamite.[10]

Between 3:00 and 4:00 a. m., the next morning, Cook and Childs placed dynamite charges at the Show-Me Power Company electric substation. At approximately 4:30 a. m., the charge at the substation detonated. Then, Cook manually detonated the charge at the bank. Upon hearing both explosions, Childs and Jerry Nash broke into Christopher's jewelry store in downtown Rolla.

On January 9, Childs and the Nash brothers were arrested in College Station, Texas. The three confessed to the bombings in Rolla. Pursuant to a plea agreement, the three named Matlock as the supplier of their dynamite and agreed to testify against him.

Matlock denied that he supplied Childs or the Nashes with dynamite and he presented an alibi defense. The essence of the alibi was that between 1:00 and 2:00 p. m. on January 4, the alleged time of the meeting, Matlock was removing a concrete floor with his backhoe at the Bow Wow dog food factory. He claimed not to have seen or talked to Childs or the Nashes that day.

Matlock testified that he and Anselm were at the plant continuously from approximately noon until he called his brother-in-law at 3:30 p. m. He also testified that he did not have a .45 caliber pistol or a shotgun and that he had never used or possessed dynamite.[11]

To establish his alibi, Matlock presented several witnesses. A contractor in the Rolla area, Moe Hogan, for whom Matlock was working at the Bow Wow factory, testified that he let Matlock into the dog food plant between 11:30 a. m. and 12:00 noon on January 4. Hogan returned to the plant between 4:00 and 4:30 p. m. and Matlock was not there. He originally estimated that approximately three and one-half hours worth of work had been completed. However, he conceded, upon cross-examination, that this estimate may have been too great.

Matlock also presented the testimony of Mary Jane Whites and her daughter Linda Langdon. They stated that Matlock and Anselm picked up the backhoe at 10:00 a. m. from the parking area in the rear of their television store and home and returned it at approximately 4:00 or 4:30 p. m. They testified that the backhoe was not at the television shop between 1:00 and 2:00 p. m. and that Matlock did not return before 4:00 p. m. On cross-examination, Whites and Langdon admitted that they were friends of Matlock and that Whites

---

**9.** Childs also testified that Matlock had a 30–30 rifle in the house. Such a rifle was found upon a search of the residence and Matlock was convicted of possession of a firearm by a felon.

**10.** Telephone records confirmed that a two-minute long distance call was made from the Manor Inn to Matlock's unlisted number at 10:00 p. m.

**11.** Special Agent Gordon L. Holdiman of the Bureau of Alcohol, Tobacco and Firearms testified that Matlock told him that he had previously used explosives.

and her husband had pledged their property as a bond for Matlock in this case.

Matlock's brother-in-law and employee, Larry Karnes, testified that at 3:30 p.m. Matlock called him. Matlock allegedly told him he was at the Bow Wow plant and that his backhoe had broken down. Matlock asked Karnes to help him.[12] Karnes said he arrived at 4:00 p. m. and that the hydraulic line on the backhoe had broken.[13] He said he followed Matlock in the backhoe and Anselm in the Blazer to the television repair shop where he removed a broken hydraulic line.

Matlock also produced the testimony of his fiance, Nan Anselm. She testified that Hogan let Matlock and her into the Bow Wow plant at approximately noon. At 3:30 p. m., the backhoe broke down and Matlock contacted Karnes from the plant. She stated that Karnes arrived at approximately 4:00 p. m. Karnes said that he could not fix the backhoe so he, in his truck, Anselm in the Blazer, and Matlock on the backhoe drove to Vernon Whites TV where they left the backhoe.

ISSUES

Matlock argues three issues on appeal:

(1) The district court erred in denying Matlock's motion to dismiss the indictment for insufficiency and vagueness.

(2) The district court erred in denying Matlock's motion for acquittal, judgment N.O.V. and new trial based on the government's failure to introduce sufficient evidence.

(3) The district court erred in sustaining the government's objection to the testimony of Martin Eimer on the grounds that it was impeachment on a collateral matter.

**12.** The government introduced telephone records showing the only call made from the Bow Wow plant to Karnes' number was at 12:44 p. m. Karnes testified Matlock called him only once, at approximately 3:30 p. m.

**13.** On cross-examination, Karnes testified that he operated backhoes for Matlock and Spencer Trucking, which parks its backhoes 200 to 300 yards from the Bow Wow factory. He admitted that on the week prior to January 4, he worked at the Bow Wow plant doing precisely

DISCUSSION

A. *Sufficiency of the Indictment*

Matlock argues that the indictment against him violated Fed.R.Crim.P. 7(c)(1) because it did not contain a plain, concise and definite written statement of the offense charged. The indictment stated:

### COUNT ONE

The Grand Jury charges:

That on or about the 4th day of January, 1981, in Phelps County, State of Missouri, within the Eastern District of Missouri, the defendant,

### DONALD P. MATLOCK,

knowingly and intentionally did possess a destructive device, that is, dynamite with an inserted blasting cap, which had not been registered to him in the National Firearms Registration and Transfer Record as required by Title 26, United States Code, Section 5841.

In violation of Title 26, United States Code, Sections 5861(d) and 5871.

### COUNT TWO

The Grand Jury further charges:

That on or about the 4th day of January, 1981, in Phelps County, State of Missouri, within the Eastern District of Missouri, the defendant,

### DONALD P. MATLOCK,

knowingly and intentionally did transfer a destructive device, that is, dynamite with an inserted blasting cap, without having filed a written application form with the Secretary of the Treasury or his

the work Matlock was supposed to finish on January 4. Karnes also concealed the fact that he had a prior felony conviction.

Karnes also testified that Matlock never had a .45 caliber pistol or a shotgun while living at his present farmstead. However, Anselm told an agent of Bureau of Alcohol, Tobacco and Firearms that there was a rifle and usually a shotgun in the corner of the front room of Matlock's house.

delegate as required by Title 26, United States Code, Section 5812.

In violation of Title 26, United States Code, Sections 5861(e) and 5871.

We have held that the standard for judging the sufficiency of an indictment is whether it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Buffington*, 578 F.2d 213, 214–15 (8th Cir. 1978) (quoting *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)).

Matlock claims that the indictment did not mention the exact location of the possession, the time of day, to whom the transfer was made or the method of the transfer. He argues that the absence of this information unfairly prejudiced his ability to formulate an alibi defense.

We hold the district court did not err in finding the indictment sufficient. It provided the date on which the unlawful acts occurred, described the destructive device involved, alleged that Matlock knowingly and intentionally possessed and transferred it, set forth Matlock's failure to register the device or make written application for its transfer, and named the laws he thereby violated. In sum, the indictment set forth in factual terms the elements of the offense sought to be charged. *See United States v. Brown*, 540 F.2d 364, 371 (8th Cir. 1976). In short, the indictment apprised the defendant of what he must prepare to meet and "its generality [did] not endanger his constitutional guarantee against double jeopardy." *Id.*

■ Similarly, we do not find the district court abused its discretion in refusing appellant's request for a bill of particulars. "The purpose of a bill of particulars is to inform the defendant of the nature of the charges against him and to prevent or minimize the element of surprise at trial." *United States v. Miller*, 543 F.2d 1221, 1224 (8th Cir. 1976), *cert. denied*, 429 U.S. 1108, 97 S.Ct. 1142, 51 L.Ed.2d 561 (1977). "Ac-quisition of evidentiary detail is not the function of the bill of particulars." *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir.), *cert. denied*, 393 U.S. 877, 89 S.Ct. 176, 21 L.Ed.2d 149 (1968).

The language of the indictment was sufficient to apprise Matlock of the charges against him. Accordingly, the district court did not abuse its discretion in denying Matlock's request for a bill of particulars. *See generally, United States v. Hill*, 589 F.2d 1344, 1351–52 (8th Cir.), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2843, 61 L.Ed.2d 287 (1979); *United States v. Miller, supra*, 543 F.2d at 1224; *Hemphill v. United States, supra*, 392 F.2d at 49.

B. *Sufficiency of the Evidence*

■ Matlock argues that the district court erred in overruling his motion for acquittal at the close of the government's evidence and at the close of all the evidence. Also, he argues the district court erred in denying his motion for judgment notwithstanding the verdict or, in the alternative, his motion for a new trial.

Matlock argues that the government's case was deficient because of its reliance on the testimony of David Childs, Jerry Nash, and Gilbert Nash. Matlock claims the credibility of their testimony was impaired because of their felony convictions for the bombing in this case, the plea bargain into which they had entered, and certain inconsistencies in their stories.

In light of the evidence produced by the government, including the testimony of thirteen witnesses, we conclude that "viewed in the light most favorable to the Government, there was sufficient evidence for reasonable minds to differ on the issue" of guilt. Therefore, the matter was correctly submitted to the jury for their determination. *United States v. Wyant*, 576 F.2d 1312, 1315 (8th Cir. 1978). The district court did not err in denying defendant's motions for acquittal.

We also find no error in the district court's denial of the motions for judgment notwithstanding the verdict and new trial.

Upon reviewing the evidence in the light most favorable to the verdict, see *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and accepting as established all reasonable inferences that tend to support the verdict, see *United States v. Overshon*, 494 F.2d 894, 896 (8th Cir.), *cert. denied*, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974), we cannot say the district court erred in denying the motions for new trial and judgment notwithstanding the verdict.

### C. *Testimony of Martin Eimer*

■ Matlock sought to introduce the testimony of Martin Eimer, a resident of Rolla, Missouri. In an offer of proof, outside the presence of the jury, Eimer stated that on the morning of January 4, he was having breakfast at a friend's house in Rolla. A man, whom he identified as Dave Childs, came to the door of the friend's house. Eimer was uncertain of the exact time but he estimated that it was between noon and 12:30 p. m. Childs asked Eimer if he owned a "big red dog." Childs said he had run over the dog.

Eimer left the house and saw the vehicle Childs was driving. He identified it as "a dark colored late model van." Eimer searched for his dog and did not see Childs again.

Eimer also claimed to have seen "one of the Nash boys." While he was unsure whether it was Gilbert or Jerry, he said the man had curly hair. He stated that he was not well acquainted with the two Nashes but he believed the person was Gilbert Nash. Counsel for the government subsequently asked the court to take judicial notice of the fact that Jerry Nash was the Nash brother with curly hair.

Matlock's counsel asked only Gilbert Nash whether he knew Eimer or whether he was in a van that ran over Eimer's dog. Gilbert denied that he knew Eimer or that he was involved in the incident.

Matlock sought to introduce the testimony of Eimer but the court found that it was impeachment on a collateral matter and refused to admit the testimony. Matlock argued that Childs, Jerry Nash and Gilbert Nash testified concerning what they did on the morning of January 4 and he was thereby entitled to submit this testimony.

The district court maintained that this was a collateral matter because it did not deal with the period between 1:00 and 2:00 p. m. when Childs and the Nashes allegedly obtained the dynamite from Matlock.

We review the district court's action in refusing to admit this evidence on an abuse of discretion standard. *United States v. Milham*, 590 F.2d 717, 721 (8th Cir. 1979). We note that evidence should not be admitted to impeach a witness on a collateral matter. *Bianchi v. United States*, 219 F.2d 182, 195–96 (8th Cir.), *cert. denied*, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955).

We hold that the district court did not abuse its discretion in refusing to allow Eimer's testimony to be admitted into evidence. As the trial court stated, the relevant time period was 1:00 to 2:00 p. m. and there was no evidence that the accident with Eimer's dog occurred any later than 12:30 p. m.

In addition, we note that there is nothing necessarily inconsistent between the incident and the testimony of the Nashes and Childs. Gilbert Nash denied that he was present at the scene. Eimer was uncertain which Nash was present and the physical description he gave fit Jerry Nash, not Gilbert Nash. Furthermore, neither Jerry Nash nor Childs was asked about the incident and the thrust of the testimony was that they were driving around Rolla looking for explosives on that morning.

In conclusion, it appears little would have been accomplished by the admission of Eimer's testimony except to confuse the jury. We hold that the district court did not abuse its discretion in refusing to admit the testimony of Eimer on the grounds that it was impeachment on a collateral matter.

### CONCLUSION

We have carefully reviewed the record and are satisfied that it amply supports the verdict of guilt.

Affirmed.